SLIP OP. 05-6

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____

| | | |
|---|---|---|
| FUYAO GLASS INDUSTRY GROUP CO., GREENVILLE GLASS INDUSTRIES, INC., SHENZHEN BENXUN AUTOMOTIVE GLASS CO., TCG INTERNATIONAL, INC., CHANGCHUN PILKINGTON SAFETY GLASS CO., GUILIN PILKINGTON SAFETY GLASS CO., WUHAN YAOHUA PILKINGTON SAFETY GLASS CO., AND XINYI AUTOMOTIVE GLASS (SHENZHEN) CO., | : : : : : : : : : : : | |
| PLAINTIFFS, | : : | |
| V. | : : | CONSOL. COURT NO. 02-00282 PUBLIC VERSION |
| UNITED STATES, | : : : : | |
| DEFENDANT, | : : | |
| AND | : : | |
| PPG INDUSTRIES, INC., SAFELITE GLASS CORP., AND VIRACON/CURVLITE, A SUBSIDIARY OF APOGEE ENTERPRISES, INC., | : : : : : : | |
| DEF.-INTERVENORS. | : | |

_____:

[Department of Commerce's Final Results of Redetermination sustained in part; remanded in part]

Dated: January 25, 2005

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Jeffrey S. Grimson*, *Paul G. Figueroa*, *Adam M. Dambrov*, *Bruce M. Mitchell*, and *Mark E. Pardo*), for plaintiffs Fuyao Glass Industry Group Co. and Greenville Glass Industries, Inc.

*Garvey, Schubert & Barer* (*William E. Perry* and *John C. Kalitka*), for plaintiffs Shenzhen Benxun Automotive Glass Co. and TCG International, Inc.

*Pepper Hamilton, LLP* (*Gregory C. Dorris*), for plaintiffs Changchun Pilkington Safety Glass Co., Guilin Pilkington Safety Glass Co., and Wuhan Yaohua Pilkington Safety Glass Co.

*White & Case* (*William J. Clinton* and *Adams C. Lee*), for plaintiff Xinyi Automotive Glass (Shenzhen) Co.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*), for defendant United States.

*Stewart & Stewart* (*Terence P. Stewart*, *Eric P. Salonen*, and *Sarah V. Stewart*), for defendant-intervenors PPG Industries, Inc., Safelite Glass Corp., and Viracon/Curvlite, a subsidiary of Apogee Enterprises, Inc.

OPINION AND ORDER

EATON, *Judge*: This consolidated antidumping action is before the court following remand to the United States Department of Commerce ("Commerce"). In *Fuyao Glass Industry Group Co. v. United States*, 27 CIT __, slip op. 03-169 (Dec. 18, 2003) (not reported in the Federal Supplement) ("*Fuyao I*"), the court sustained in part and remanded in part Commerce's final determination on windshields from the People's Republic of China ("P.R.C."). *See* Certain Automotive Replacement Glass Windshields From the P.R.C., 67 Fed. Reg. 6482 (ITA Feb. 12, 2002) (final determination) ("Final Determination"), *amended by* Certain Automotive Replacement Glass Windshields from the P.R.C., 67 Fed. Reg. 11,670 (ITA Mar. 15, 2002) ("Am. Final Determination").

BACKGROUND

Plaintiffs Fuyao Glass Industry Group Co., Greenville Glass Industries, Inc., Shenzhen Benxun Automotive Glass Co., TCG International, Inc., Changchun Pilkington Safety Glass Co., Guilin Pilkington Safety Glass Co., Wuhan Yaohua Pilkington Safety Glass Co., and Xinyi Automotive Glass (Shenzhen) Co. (collectively, "Plaintiffs") are exporters to the United States of automotive replacement glass windshields (the "Windshields") from the P.R.C., a nonmarket economy country ("NME").[1]  This dispute involves (1) the price of float glass,[2] an input used in the manufacture of Windshields, that Plaintiffs purchased from suppliers in the market economy countries of Korea, Thailand, and Indonesia, and (2) the challenged treatment of other factors of production. In *Fuyao I*, familiarity with which is presumed, the court remanded to Commerce on several grounds. Pursuant to the court's order, Commerce issued its Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), and concluded that the record evidence supported its findings in the Final Determination with respect to four of the five remanded issues. Plaintiffs and Defendant-Intervenors PPG Industries, Inc., Safelite Glass Corp., and Viracon/Curvlite, a subsidiary of Apogee Enterprises, Inc. (collectively, "Defendant-Intervenors") timely responded to the Remand Results. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000). After

---

[1]    A nonmarket economy country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority." 19 U.S.C. § 1677(18)(C)(i).

[2]    For information regarding the float glass production process, see http://alzonca.tripod.com/glassprocess.html (last visited Jan. 25, 2005).

reviewing the parties' submissions, the administrative record, and all other papers and

proceedings, the court remands this matter to Commerce for a second time.


STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."

19 U.S.C. § 1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d

1369, 1374 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2000)). "Substantial

evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Huaiyin,* 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

229 (1938)). The existence of substantial evidence is determined "by considering the record as a

whole, including evidence that supports as well as evidence that 'fairly detracts from the

substantiality of the evidence.'" *Id.* (citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562

(Fed. Cir. 1984)). Furthermore, "[a]s long as the agency's methodology and procedures are

reasonable means of effectuating the statutory purpose, and there is substantial evidence in the

record supporting the agency's conclusions, the court will not impose its own views as to the

sufficiency of the agency's investigation or question the agency's methodology." *Ceramica*

*Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd*

810 F.2d 1137 (Fed. Cir. 1987) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,

467 U.S. 837, 843 (1984); *Abbott v. Donovan*, 6 CIT 92, 97, 570 F. Supp. 41, 47 (1983)).

DISCUSSION

I.     Reason to Believe or Suspect That Market Economy Purchases of Float Glass Are
       Subsidized

       A.     The "Reason to Believe or Suspect" Standard

       On remand, the court instructed Commerce to "provide specific and objective evidence"

to support its findings "that (1) all exports from Korea, Thailand, and Indonesia are subsidized,

[and] (2) that, in particular, exports of float glass from these countries are subsidized." *Fuyao I*,

27 CIT at __, slip op. 03-169 at 24.  In particular, the court noted that, with respect to the "reason

to believe or suspect" standard, Commerce used the phrase "are subsidized," rather than "may be

subsidized," and had thereby established a higher standard (i.e., that it should disregard prices it

has reason to believe or suspect *are* subsidized) than that contemplated by the legislative history

it consulted in constructing its methodology[3] (i.e., that Commerce should disregard prices it

---

       [3]      The legislative history Commerce examined in developing its methodology for
considering subsidization in an NME context pertains to 19 U.S.C. § 1677b(c)(4), which deals
with valuation of factors of production in a market economy context.  The statute states:

> The administering authority, in valuing factors of production under
> paragraph (1) [i.e., with respect to surrogate values], shall utilize,
> to the extent possible, the prices or costs of factors of production in
> one or more market economy countries that are—
>
> (A) at a level of economic development comparable to that of the
> nonmarket economy country, and
>
> (B) significant producers of comparable merchandise.

       The legislative history Commerce examined in developing its methodology for
considering subsidization in an NME context deals with valuation of factors of production in a
market economy context.  That legislative history states: "In valuing such factors, Commerce
shall avoid using any prices which it has reason to believe or suspect may be dumped or
subsidized prices."  Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep. No. 100-
576, at 590 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1623.

believes *may be* subsidized).  *Id*. at __, slip op. 03-169 at 17 n.14, 20 n.16.  With respect to its

use of the word "are" rather than "may," Commerce states on remand:

> The "reason to believe or suspect" standard establishes a lower
> threshold than what is required to support a firm conclusion.
> Regardless of whether [Commerce] says "are" or "may," the
> "reason to believe or suspect" [standard] indicates that Commerce
> has not definitively determined that prices were in fact subsidized
> or dumped.  It certainly was not Commerce's intent in its choice of
> language to alter a standard that it has applied many times, and that
> the CIT has affirmed on numerous occasions.

Remand Results at 8 (internal citation omitted).  While Commerce seems to indicate that its

decision to employ the word "are" rather than "may" has no effect on the "reason to believe or

suspect" standard, it is worth noting that, with one exception, all of the cases on review in this

Court have used a form of the word "are" in their discussions.  *See, e.g., Luoyang Bearing Corp.*

*v. United States*, 28 CIT __, __, slip op. 04-53 at 25 (May 18, 2004) ("The Court finds that when

Commerce has reason to believe or suspect that a market-economy supplier's prices *are*

subsidized, Commerce may reject market prices paid to the supplier in favor of surrogate prices

for its calculation of [normal value].") (emphasis added); *see also Peer Bearing Co. v. United*

*States*, 27 CIT __, __, 298 F. Supp. 2d 1328, 1336–37 (2003) ("Commerce's reason to believe or

suspect that [Plaintiff's] supplier's prices *were* subsidized stemmed from a study, undertaken in

connection with a previous investigation of steel products, in which Commerce discovered

significant subsidies.") (emphasis added).  The court has also examined several of Commerce's

preliminary and final results of sales at less than fair value investigations, all of which used the

word "are."  *See, e.g.*, Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from

the P.R.C., 68 Fed. Reg. 70,488, 70,489 (ITA Dec. 18, 2003) (final results) ("[W]e do not use the prices paid by PRC producers of [the subject merchandise] for inputs that we have a reason to believe or suspect *are* subsidized." (emphasis added); *see also* Certain Ball Bearings and Parts Thereof from the P.R.C., 67 Fed. Reg. 63,609, 63,614 (ITA Oct. 15, 2002) (prelim. determination) ("[C]onsistent with [Commerce's] practice concerning subsidized imports, we have not used the actual prices paid by PRC producers of material inputs which we have reason to believe or suspect *are* subsidized.") (emphasis added); Magnesium Metal From the P.R.C., 69 Fed. Reg. 59,187, 59,196 (ITA Oct. 4, 2004) (prelim. determination) ("We have found in other proceedings that these countries maintain broadly available, non-industry-specific export subsidies and, therefore, it is reasonable to infer that all exports to all markets from these countries *are* subsidized.") (emphasis added); Hand Trucks and Certain Parts Thereof From the P.R.C., 69 Fed. Reg. 29,509, 29,516 (ITA May 24, 2004) (prelim. determination).  Having established this standard, Commerce may not abandon it without explaining why.  *See Acciai Speciali Terni S.p.A. v. United States*, 25 CIT 245, 274–75, 142 F. Supp. 2d 969, 998 (2001) (noting that Commerce may change its position on an issue "providing that it explains the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence.") (internal quotation omitted).  Thus, the court finds no reason to change its discussion found in *Fuyao I*.


In any event, while Commerce states that the "reason to believe or suspect" standard establishes a lower threshold than what is required to support a firm conclusion, it nevertheless "relied on its [countervailing duty] determinations . . . as substantial evidence to assess whether

there was specific and objective evidence to support a reason to believe or suspect that Fuyao's

market economy purchase prices *were* distorted . . . ." Remand Results at 10 (emphasis added).

This language echoes that found in *China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 27

CIT __, __, 264 F. Supp. 2d 1229, 1243 (2003) ("*CMC I*"), in which the court held that

Commerce "must demonstrate particular, specific, and objective evidence to uphold its reason to

believe or suspect that the prices [the plaintiff] paid the supplier for the inputs were subsidized,"

and *China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 27 CIT __, __, 293 F. Supp. 2d 1334,

1337–38 n.4 (2003) ("*CMC II*"), in which the court reiterated its "insistence on specific and

objective evidence (even for a 'belief' or 'suspicion' [that prices were subsidized]) [a]s an

integral part of the substantial evidence analysis."); *see also Peer Bearing*, 27 CIT at __, 298 F.

Supp. 2d at 1336 (internal quotation omitted) (noting that in order for a reasonable belief or

suspicion to exist, "there must be 'a particularized and objective basis for suspecting' the

existence" of subsidies.); *see also* Issues and Decision Mem. for Tapered Roller Bearings and

Parts Thereof, Finished and Unfinished, From the P.R.C., 66 Fed. Reg. 57,420 (ITA Nov. 15,

2001) (final results), 2001 WL 1456781, at Comment 12 (in which Commerce concluded that

"this particular and objective evidence (that all exporters from these countries can benefit from

these broadly available subsidies) supports a reason to believe or suspect that prices of the inputs

purchased from these countries are subsidized.") (internal quotation omitted); Remand Results at

10 ("[P]rior [countervailing duty] findings may provide the basis for [Commerce] to also

consider that it has particular and objective evidence to support a reason to believe or suspect that

prices of the inputs from that country are subsidized."). Based on the foregoing, the court will

rest its conclusion on whether the "reason to believe or suspect" standard is satisfied by

determining if Commerce has found "specific and objective evidence" to support its

determination.


1.      Countervailing Duty Determinations

This Court has held that evidence of existing countervailing duty determinations, absent

some evidence that the supplier of the merchandise could have taken advantage of the subsidy,

does not satisfy the "reason to believe or suspect" standard. *See Luoyang Bearing Factory v.*

*United States*, 27 CIT __, 259 F. Supp. 2d 1357, 1364 (2003) ("[T]he various countervailing duty

determinations relied upon by Commerce *do not* include the hot-rolled bearing quality steel bar,

the steel product *at issue in this case.*") (emphasis added); *see also CMC II*, 27 CIT __, __, 293

F. Supp. 2d 1334, 1336 ("") (noting that in the prior case, *CMC I*, the court found Commerce's

evidence of a subsidy program "involving subject merchandise *other than* [the merchandise at

issue here] and companies *other than* [Plaintiff's] supplier" to be insufficient, since "neither the

subject merchandise in question, nor [China National's] supplier was ever specifically

investigated in a countervailing duty investigation.") (emphases added); Tapered Roller Bearings,

66 Fed. Reg. at Comment 1 ("[W]e concluded that the 'believe or suspect' standard is met when

the importing country has a dumping or subsidy finding *on the input in question*.") (emphasis

added). In finding that Commerce had sufficiently demonstrated on remand that it had reason to

believe or suspect that the Plaintiff's suppliers received subsidies, the court in *CMC II* explained:

> In the *Remand Results*, Commerce emphasizes that CMC's
> supplier is a "member of a subsidized industry" and "could have
> benefitted" from subsidies generally available in the exporting
> country for exporters of steel products, regardless of the type of
> product or company, and further emphasizes that such subsidies

were specifically found to be utilized by several steel producers.

*Id*. at 1337 (internal citation and footnote omitted); *see also CMC I*, 264 F. Supp. 2d at 1233

(noting that during oral argument, Commerce stated: "[A]s a matter of commonsense, we can

assume that no one is going to leave money on the table. [Companies] are going to take

advantage of a program that's out there and exists.").

Thus, after having examined *Luoyang Bearing Factory*, *CMC I* and *II*, and Commerce's

determination in Tapered Roller Bearings, the court finds that, to justify a finding with respect to

subsidization, Commerce must demonstrate by specific and objective evidence that (1) subsidies

of the industry in question existed in the supplier countries during the period of investigation

("POI"); (2) the supplier in question is a member of the subsidized industry or otherwise could

have taken advantage of any available subsidies; and (3) it would have been unnatural for a

supplier to not have taken advantage of such subsidies.

In *Fuyao I*, the court found that "none of the record evidence for Korea, Thailand, or

Indonesia indicates whether the subsidy programs cited by Commerce are available to all

exporters, or to float glass producers in particular, in the supplier countries." *Fuyao I*, 27 CIT at

__, slip op. 03-169 at 22. The court explained:

> First, none of the more than 80 countervailing duty determinations
> cited by Commerce concerning Korean subsidies involved float
> glass, the product at issue in this case, nor for that matter did any of
> the countervailing duty determinations involve glass of any kind.
> . . . In like manner, none of the more than 170 countervailing duty
> determinations cited by Commerce for Thailand concern any kind
> of glass. . . . As to Indonesia, one of the countervailing duty

> determinations cited by Commerce concerns extruded rubber
> thread, and all of the others concern apparel and textiles (luggage,
> handbags, gloves, and the like). Not one of the determinations
> concerned float glass.

*Fuyao I*, 27 CIT at __, slip op. 03-169 at 20–22. The court then instructed Commerce to revisit

whether it had reason to believe or suspect that all exports from Korea, Thailand, and Indonesia

are subsidized and, if so, to "provide specific and objective evidence to support these findings."

*Fuyao I*, 27 CIT at __, slip op. 03-169 at 24. Had it chosen to do so, Commerce could have re-

opened the record upon remand in order to obtain additional evidence to support its findings. *See*

*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT __, __, 318 F. Supp. 2d 1339, 1353

(2004) ("If necessary, Commerce should re-open the record to establish a market value to

compare to the . . . price [relied upon by Commerce] or to obtain another source for valuing [the

subject merchandise]."). For the most part, however, Commerce has chosen to present no new

evidence, claiming that it "is limited to the record evidence, thus no new factual information may

be presented . . . ." Remand Results at 33. Thus, Commerce again cites the U.S. countervailing

duty ("CVD") determinations it cited in its Final Determination. With respect to these CVD

determinations, Commerce states that

> where the facts developed in U.S. or third-country CVD findings
> include subsidies that appear to be used generally (in particular,
> broadly available, non-industry specific export subsidies), it is
> reasonable to infer that all exports to all markets from the
> investigated country are subsidized . . . [p]rior CVD findings may
> provide the basis for [Commerce] to also consider that it has
> particular and objective evidence to support a reason to believe or
> suspect that prices of the inputs from that country are subsidized.

Remand Results at 10 (internal citation omitted). In addition, with respect to these prior CVD

findings, Commerce states that

> [e]ach of the U.S. CVD determinations found countervailable general, non-industry specific export subsidy programs available in Korea, Thailand, and Indonesia. It is the very fact that the subsidy programs are based on export performance, that [Commerce] reasonably infers that the float glass suppliers from Korea, Thailand, and Indonesia may[4] have benefitted from these subsidies programs. Export subsidies that are not bestowed to a specific company or industry, such as those found to exist by [Commerce's] own investigations, are presumed to benefit all exporters that engage in international trade, such as Fuyao's suppliers from these countries.

*Id*. at 11. Commerce cites no new evidence to bolster its findings; rather, it relies upon the holding in *CMC II*. In *CMC II*, the court found that it was reasonable for Commerce to infer that a market economy supplier benefitted from subsidies, given the competitive nature of the industry and the fact that the supplier had engaged in foreign trade.[5] *Id*. at 1339. In its Remand Results, Commerce argues that "[t]he court in [*CMC II*] made this determination after accepting [Commerce's] argument that based on its own CVD determinations, there was substantial evidence on the record that the factor input prices paid by the respondent may have been subsidized due to 'generally available, non-company specific export subsidies.'" Remand Results at 9.

Plaintiffs dispute Commerce's use of prior CVD findings to support its reason to believe

---

[4]    It is worth noting that Commerce appears to have applied a lesser standard than is required by its past practice, in which the "are subsidized" standard was used. *See* discussion *supra* pp. 5–7.

[5]    The court in *CMC II* also considered that CMC's supplier, an exporter of steel products, could have benefitted from subsidies generally available in the exporting country for steel exporters, and that such subsidies were specifically found to be utilized by several steel producers. *CMC II*, 27 CIT at __, 293 F. Supp. 2d at 1337.

or suspect that the prices Fuyao paid to its float glass suppliers may have been subsidized.

Plaintiffs maintain that

> *none* of the countervailing duty determinations cited by Commerce
> concerning Korea, Thailand or Indonesia involve float glass
> producers or similar industries, and there is no record evidence to
> suggest that the subsidy programs are even available to float glass
> producers. . . . In light of the above, Commerce's heavy reliance
> on [*CMC II*] is misplaced. China National involved market
> economy purchases of steel products as opposed to float glass. In
> that case, there was substantial record evidence of subsidy
> programs specifically benefitting the steel industry, and Commerce
> emphasized in its remand that any member of the steel industry
> "'could have benefitted' from subsidies generally available in the
> exporting country for exporters of steel products, regardless of the
> type of product or company, and further emphasize[d] that such
> subsidies were specifically found to be utilized by several steel
> producers."

Fuyao's Comments Regarding Remand Results ("Fuyao's Comments") at 3–4 (emphasis in

original; internal citation and footnote omitted). Thus, Plaintiffs claim that Commerce's reliance

on *CMC II* is misplaced because of the differences in the evidence produced by Commerce.

2.      Other Evidence

In addition to its CVD determinations, Commerce again cites World Trade Organization

("WTO") Reports for Korea, Thailand, and Indonesia as "particular and objective evidence

which supports [its] reason to believe or suspect that the market economy purchase prices of float

glass in this case may be subsidized." Remand Results at 33. With respect to these reports, the

court in *Fuyao I* stated:

> The WTO Report for Korea indicates only that "Korea has
> aggressively promoted exports through a variety of policy tools,"
> but does not indicate which exporters benefit from such tools. . . .

> Likewise, the WTO Report for Thailand lists several financing
> schemes for exporters, but does not provide information as to
> restrictions on or qualifications for receiving such assistance.
> . . . Finally, the WTO Report for Indonesia, which reviews exports
> subsidies and other promotion policies in that country, was
> completed in 1999, one year before the period of review for this
> investigation.

*Fuyao I*, 27 CIT at __, slip op. 03-169 at 20, 21, 22 (internal citation omitted).  In addition,

Commerce again cites the U.S. Trade Representative's 2001 National Trade Estimate Report on

Foreign Trade Barriers ("NTE Report") concerning Korea's and Indonesia's export subsidy

practices.  As to these reports, the court in *Fuyao I* stated:

> [T]he NTE Report [for Korea] discusses several export loan and
> credit programs, but does not indicate which sectors, producers, or
> products are eligible for such aid. . . . [For Thailand,] the NTE
> Report indicates only that "Thailand's programs to support trade in
> certain manufactured products . . . may constitute export
> subsidies." . . .  The NTE Report for Indonesia indicates that the
> export subsidies for "special exporters" (a term which is not
> defined) lapsed in 1999.

*Id*.  Thus it is evident that, in large measure, Commerce has chosen to present nothing new with

respect to these matters; therefore, the observations contained in *Fuyao I* remain valid.

Only one of the reports Commerce cites has been sufficiently explained in the Remand

Results so as to provide a reason to believe or suspect that the prices Plaintiffs paid to their

suppliers were subsidized.  With respect to reports downloaded from the Thailand Board of

Investment ("BOI") Web site concerning incentives that are provided to certain companies in

Thailand, the court in *Fuyao I* found that "they are available for several 'priority areas' such as

agriculture and public utilities, as well as for 'targeted industries.'  However, none of the targeted

industries listed appear to include the manufacture of float glass." *Fuyao I*, 27 CIT at __, slip op.

03-169 at 21.   In the Remand Results, however, Commerce explained:

> Chapter 4 of the BOI Guide provides a list of "Activities Eligible
> for Investment Promotion."  Section 2, number 2.5, on page 26 of
> Chapter 4 of the BOI Guide, specifically lists [] the "manufacture
> of glass or glass products" as an activity eligible for investment
> promotion with the only condition being that the producer must be
> located in either "zone 2 or 3."  Page 8 of the BOI Guide defines
> "Zone 2" as including the province of [[          ]].  [In] the "BOI
> Promoted Company Database," which lists the companies who
> have been approved to receive BOI incentives. [[
>                                     ]], one of Xinyi's market economy float
> glass suppliers is listed as a company which has been approved for
> BOI incentives because it is located in the [[                    ]]
> province.

Remand Results at 34.

     Based on the new information and explanation, the court finds that Commerce has shown

by specific and objective evidence that there is "reason to believe or suspect" that one of

Plaintiffs' suppliers received subsidies.  First, it is clear that subsidies of the industry in question,

i.e., the manufacture of float glass, existed in the supplier countries during the POI, and that the

supplier in question, [[                                      ]], is a member of that industry and could

have taken advantage of any available subsidies.  Moreover, the court finds that it would have

been unnatural for [[                      ]] not to have taken advantage of any available

subsidies, given "the competitive nature of market economy countries." *Id*. at 14.  For these

reasons, the court finds that Commerce has shown that subsidies of the industry in question

existed in the supplier country, Thailand, during the period of investigation; that the supplier in

question is a member of the subsidized industry, and could have taken advantage of any available

subsidies; and that it would have been unnatural for that supplier to not have taken advantage of

any available subsidies.

With respect to other suppliers in other market economy countries, however, Commerce

has not provided specific and objective evidence to support a reason to believe or suspect that the

prices Fuyao paid to these suppliers were subsidized. On remand, Commerce may concur with

the court's conclusion or, if it continues to find that it has reason to believe or suspect that these

prices were subsidized, it must re-open the record to provide, if possible, additional evidence to

support its conclusion that the prices Fuyao paid to its suppliers were subsidized. Provided,

however, that because Congress did not intend that Commerce conduct a formal investigation to

determine a company's particular subsidy level in a market economy country, it is not required to

do so here. *See* Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep. No. 100-576,

at 590, *reprinted in* 1988 U.S.C.C.A.N. 1623.

B.      *De Minimis* Subsidization Levels

Next, the court in *Fuyao I* addressed Commerce's claim that "the level of subsidization in

a CVD finding on a certain product and on certain exporters, whether de minimis or not, is

irrelevant." *Fuyao I*, 27 CIT at __, slip op. 03-169 at 24 (internal citation omitted). With respect

to this finding, the court instructed Commerce to

> fully and completely explain why it would be reasonable to resort
> to surrogate values, rather than actual amounts paid, where any
> subsidization—even *de minimis* subsidization—is present. In
> particular, Commerce shall explain how, if a subsidy is found to be
> *de minimis*, that subsidy would nevertheless rise to the level of a

> distortion in prices that would justify Commerce's decision to
> depart from actual input prices.

*Fuyao I*, 27 CIT at __, slip op. 03-169 at 24–25 (internal citation and footnote omitted).  In its

Remand Results, Commerce states:

> [T]he fact that one particular program confers a "de minimis" level
> of subsidy has no relevance to the issue of whether or not
> [Commerce] may disregard a market economy price it has reason
> to believe or suspect is subsidized.  What is relevant to
> [Commerce's] determination of whether it has a reason to believe
> or suspect that prices may[6] be subsidized, is the existence of a
> subsidy program.  A subsidy is, in itself, a market distortion.
> Further, as [Commerce] discussed in the <u>Draft Results</u> as well as
> above, Congress does not require an actual finding of
> subsidization, nor does it require a formal investigation.

Remand Results at 37–38.

Plaintiffs question Commerce's reliance on multiple findings of *de minimis* subsidization,

since elsewhere in the antidumping laws, *de minimis* subsidization levels are treated as zero.  *See*

*Fuyao I*, 27 CIT at __, slip op. 03-169 at 24 n.17 ("[C]ompanies with *de minimis* dumping

margins are considered to have a dumping margin of zero."); *see also* Xinyi Automotive Glass

(Shenzhen) Co.'s Comments on Remand Determination ("Xinyi's Comments") at 8 ("If the level

of subsidization falls below the *de minimis* threshold,[7] [in the context of market economy

countries, Commerce] 'shall disregard [the] de minimis countervailable subsidy.'"); *Carlisle Tire*

---

[6]      Here again, Commerce appears to have applied a lesser standard than is required
by its past practice.  *See* discussion *supra* pp. 5–7.

[7]      The *de minimis* threshold is 3% for Korea, Thailand, and Indonesia.  *See*
Developing and Least-Developed Country Designations under the Countervailing Duty Law, 63
Fed. Reg. 29,945, 29,948 (ITA June 2, 1998).

*and Rubber Co. v. United States*, 1 CIT 352, 354, 517 F. Supp. 704, 706 (1981) ("[T]here is clear

precedent for applying the *de minimis* rule to 'mandatory' statutes and the countervailing duty

statute in particular. Considering that a *de minimis* benefit is, by definition, of no significance

whatever . . . . The court therefore holds that the *de minimis* doctrine is applicable to cases

arising under the countervailing duty statute.").


"It is well-established that [C]ommerce is granted tremendous deference in selecting the

appropriate methodology. As long as [its] decision is reasonable, then Commerce has acted

within its authority even if another alternative is more reasonable." *Koyo Seiko Co. v. United

States*, 16 CIT 539, 541–42, 796 F. Supp. 517, 523 (1992). Here, "the statute [19 U.S.C. §

1677bb(c)(1)] does not specify a particular level of subsidization at which actual market prices

may be discarded. In fact, the statute does not mention market prices."[8] *CMC II*, 27 CIT at __,

293 F. Supp. 2d at 1339. Therefore, as the Court in *Peer Bearing* explained:

> The level of subsidization does not prevent Commerce from
> determining that it has "reason to believe or suspect" that prices
> paid are subsidized. Any level of subsidization found in the
> exporting country is enough evidence to support a determination
> that Commerce has "reason to believe or suspect" that prices are
> distorted.

*Peer Bearing*, 298 F. Supp. 2d at 1337. This conclusion is particularly appropriate in light of the

legislative history of the market economy statute Commerce consulted when constructing its

NME methodology. This legislative history indicates that, in a market economy, Congress did

---

[8]      The court notes that the statutory definition of *de minimis* is used only in the
context of the industry under investigation, not individual suppliers. *See* 19 C.F.R. § 351.106
(2004). There is no legislation requiring that this definition be carried over into other contexts,
nor does any legislative history so indicate.

not intend that Commerce should conduct a formal investigation to determine a company's

particular subsidy level. *See* Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep.

No. 100-576, at 590, *reprinted in* 1988 U.S.C.C.A.N. 1623. Since a formal investigation would

be required to determine exactly what level of subsidization a supplier received, it is reasonable

for Commerce to conclude that the level of subsidization should not be a factor in its

determination in either a market economy or NME context. *See Pesquera Mares Australes Ltda.*

*v. United States*, 266 F.3d 1372, 1379 (Fed. Cir. 2001) ("We conclude that *Chevron* deference is

afforded to Commerce's statutory interpretations as to the appropriate methodology . . . .").

Thus, the court finds that Commerce has sufficiently explained its decision to resort to surrogate

values here, and affirms its conclusion.


II.      Water as a Separate Factor of Production

         In its Final Determination, Commerce found that "[i]t is clear from the production

process for windshields that water usage is significant . . . ." Issues and Decision Mem. for the

Final Determination, 2002 WL 243660, at Comment 25. Commerce then valued water as a

separate factor of production, rather than as a part of factory overhead. Commerce stated that

this treatment would not result in an impermissible double counting of water as an input

"because it 'valued the overhead using only the line-items 'depreciation', 'stores and spare parts

consumed', and 'repairs and maintenance' from [Indian surrogate company] St. Gobain's annual

report. None of these line items would include the input water." *Fuyao I*, 27 CIT at __, slip op.

03-169 at 26 (internal citation omitted). Its its calculations, Commerce relied on the financial

statements of the Indian float glass manufacturer, St. Gobain. Because the St. Gobain financials

could reasonably be assumed to encompass all of the factors of production for Windshields, the court questioned whether double counting would not result from Commerce's treatment and challenged its conclusion that water could not reasonably be included under "stores and spare parts," stating:

> First, the amount allocated to "stores and spare parts" is sufficiently large to accommodate a significant input such as water. Second, only "stores and spare parts" could arguably include water, since it is improbable that water would be included under "depreciation" or "repairs" as those line items have been defined.

*Id*. at 27. The court instructed Commerce "to demonstrate that its decision to value water as a separate factor of production, rather than as part of factory overhead, does not result in impermissible double counting." *Id*. at 27–28.

In its Remand Results, Commerce was unable to identify where water was accounted for in St. Gobain's financial statement, even though the statement apparently accounted for all of the production costs for its windshields. Rather, Commerce found that, "based on [our] experience and observations, where a producer uses water for incidental purposes, it will be included in factory overhead, but where it is used in significant quantities, that company will treat water as a separate factor of production." Remand Results at 43. Commerce further explained that "our experience in conducting antidumping reviews leads us to find that the 'stores and spare parts' line item consists of 'equipment and machinery used in the production process,' such as 'tools, grinding wheels, and spare parts' for the equipment and machinery." *Id*.

Commerce also addressed the court's concern that, since "stores and spare parts"

comprised 26% of the total factory overhead, that amount "is sufficiently large to accommodate a significant input such as water." *Fuyao I*, 27 CIT at __, slip op. 03-169 at 27. Commerce explained:

> Our examination of Saint Gobain's financial statements indicates that the amount allocated to "stores and spare parts" that could reasonably be determined to include water is, in fact, only 9% of factory overhead. We made this determination based on the fact that in Saint Gobain's financial statement the line item "stores and spare parts" is subdivided into "imported" and "indigenous" "stores and spare parts." We find that the water, used as described in the production process, would not be imported, but rather is indigenous. The "indigenous" subcategory of "stores and spare parts" accounts for only 36.42% of the total of "stores and spare parts," while "imported" "stores and spare parts" make up the other 63.58% of the total of "stores and spare parts." Thus, while the whole line item of "stores and spare parts" comprises 26% of factory overhead, the amount allocated to "stores and spare parts" that could reasonably be determined to hold water (<u>i.e.,</u> "indigenous stores and spare parts") is only 36.42% of that 26%, or 9% of factory overhead. There would be no room in this 9% figure to accommodate both the normal tools, equipment, spare parts and other indirect materials that a company such as the producer must keep on hand, and to accommodate such a significant input of water.

Remand Results at 44–45.

Next, Commerce maintained that water is a "direct input" in the production of automotive replacement glass. In reaching this conclusion, Commerce outlined three criteria for determining when water should be valued separately: "Normally, when water is used for more than incidental purposes, is required for a particular segment of the production process, or appears to be a significant input in the production process, it is [Commerce's] practice to value water directly, and not in factory overhead." *Id*. at 40.

Finally, Commerce cited its "unique ability" and "experience" in conducting antidumping investigations to support its decision to value water as a separate factor of production. *Id*. at 45. Commerce stated:

> In this investigation, [Commerce] based its determination on its experience and expertise in conducting antidumping investigations and administrative reviews, its longstanding practice of determining the manner in which water is treated for purposes of assigning a surrogate value, its verification of Respondents' production and accounting processes, and its analysis of the surrogate financial statements, to determine that water is valued separately in the production of [the subject merchandise], and not in factory overhead.

*Id*.

Plaintiffs assert two principal arguments. First, they argue that Commerce cannot rely merely on its "ability" and "experience" for its decision to value water separately. "To the contrary, Commerce has the obligation to demonstrate that its decision was based on substantial evidence in this case, regardless of its experience in other cases." Xinyi's Comments at 29; *see also* Fuyao's Comments at 8 ("Commerce['s] finding is supported by nothing more than assumptions and speculations about the Saint Gobain financial statement, which is wholly inadequate."). Second, Plaintiffs argue that Commerce's own determinations, several of which are cited by both parties, actually support Plaintiffs' position, not Commerce's.

After surveying a number of Commerce's determinations, the court has discerned several criteria that Commerce uses in determining whether a given material should be included as a part of factory overhead. First, Commerce must consider whether the material is physically

incorporated into the final product, since materials that are not physically incorporated into a

final product are considered to be "indirect" materials that are valued as part of factory overhead.

In Brake Drums and Brake Rotors From the P.R.C., 62 Fed. Reg. 9160 (ITA Feb. 28, 1997) (final

determination), Commerce stated:

> According to the [Indian] Compendium of Statements and
> Standards, in order for a material to be considered as part of factory
> overhead, it must "assist the manufacturing process, but . . . not
> enter physically into the composition of the finished product." We
> agree that dextrin, steel shot, antirust, cutting oil, cleaning agent
> and dehydrating oil are indirect materials and *should be treated as*
> *part of factory overhead, because the function of these materials is*
> *to "assist" in the manufacturing process and [they] do not enter*
> *physically into the composition of the finished product*.

*Id*. at 9,169 (emphasis added). Commerce repeated this policy in the Issues and Decision Mem.

for Certain Malleable Iron Pipe Fittings From the P.R.C., 68 Fed. Reg. 61,395 (ITA Oct. 28,

2003) (final results):

> Therefore, because [Commerce] has recognized in other PRC
> antidumping cases that these inputs are not physically incorporated
> into the final product and that Indian accounting practices treat
> molding materials (sands, molding clays, bentonite and coal
> powder) as overhead items, we agree with respondents that we
> should not treat these items as direct material inputs.

Comment 11. In Bicycles From the P.R.C., 61 Fed. Reg. 19,026 (ITA Apr. 30, 1996) (final

results), Commerce further distinguished between materials incorporated into the finished

product and those that are "consumables":

> [T]he chemicals in question are essential for producing the finished
> product and are incorporated into the product (i.e., in pre-treating
> the components, *the chemicals permeate the components and are*
> *not completely washed off*). These chemicals appear to be
> significant inputs into the manufacturing process rather than
> miscellaneous or occasionally used materials, i.e., cleaning

supplies which might normally be included in consumables.

*Id*. at 19,040.

Second, in the past, Commerce has included water in factory overhead unless it is specially treated and required for a particular segment of the production process. In Saccharin from the P.R.C., 59 Fed. Reg. 58,818 (ITA Nov. 15, 1994) (final determination), Commerce explained:

> We agree with respondents that water . . . should be included in factory overhead. Because it is normal practice to include such cost in factory overhead, we find it reasonable to presume that water . . . [is] included in the Indian overhead value we used. Therefore, if we were to assign separate values to water . . . we would be double-counting the cost. However, with respect to the distilled water . . . we are not persuaded that the input would normally be included in factory overhead. Unlike other forms of water used in production facilities, distilled water is specially processed, packaged, and shipped to customers. Further, it is required for a particular segment of the production process for which the standard water will not suffice.

*Id*. at 58,824; *see also* Issues and Decision Mem. for Sebacic Acid from the P.R.C., 65 Fed. Reg. 49,537 (ITA Aug. 14, 2000), (final results), 2000 WL 1139088, at Issue 3 ("Because the respondents in this proceeding have not indicated the use of a special type of water in their sebacic acid production . . . we have not separately valued water in accordance with our practice.").

Finally, where Commerce does not know whether the cost of water is included in the surrogate value for factory overhead, as here, Commerce will determine on a case-by-case basis whether it will value water separately or not. *See id*. ("[Commerce] . . . could not separate the

cost of water from the factory overhead expense . . . .  Consequently, because normal accounting practice includes the cost of water in factory overhead expense, [Commerce] presumed that the cost of water was included in the [factory] overhead data in order to avoid 'double-counting' water costs."); *cf.* Issues and Decision Mem. for Freshwater Crawfish Tail Meat from the P.R.C., 66 Fed. Reg. 20,634 (ITA Apr. 24, 2001) (final results), 2001 WL 416758, at Comment 7 (valuing water as a separate factor of production on the grounds that "the process of cleaning . . . requires large quantities of water . . . .").

Based on the foregoing survey of Commerce's determinations, it appears that Commerce's "experience" does not demand the findings reached here.  As a result, the court finds that Commerce has not justified its conclusion that water should be included as part of factory overhead, and not valued as a separate factor of production.  First, the water at issue here is used solely for cleaning the Windshields, and is not physically incorporated into the finished product.  As Commerce stated in its Remand Results: "Water is vital to the production process to wash the glass after cutting to ensure that it is free of debris, and to clean the glass prior to the 'sandwiching' of the PVB between the panes of glass."  Remand Results at 41.  Thus, under the reasoning of Brake Drums and Malleable Iron Pipe Fittings, water that is not physically incorporated into the finished product is typically accounted for in factory overhead, in accordance with standard Indian accounting practices.

Second, the determinations in Saccharin and Sebacic Acid confirm that Commerce has

differentiated between standard water use and specialized water use. In Saccharin, Commerce found that standard water should be included in factory overhead. Only distilled water, "for which the standard water will not suffice," was to be valued as a separate factor of production. Here, Commerce makes no claim that specialized water was used for cleaning the Windshields.

Third, the determination in Sebacic Acid instructs that, where Commerce is unable to determine where water is accounted for in the surrogate financial statement, normal accounting practices dictate that the cost of water is treated as a factory overhead expense and not valued as a separate factor of production.

Finally, Commerce has provided no evidence tending to justify its conclusion that "[t]here would be no room in this 9% [indigenous stores and spare parts] figure to accommodate . . . such a significant input of water." Remand Results at 44–45.

Although the court is mindful of the deference owed to Commerce's "specialized role as administrator of antidumping investigations," *Union Camp Corp. v. United States*, 23 CIT 264, 283, 53 F.Supp.2d 1310, 1328 (1999), Commerce's determinations must nevertheless be supported by substantial evidence. Here, Commerce has failed to adequately explain why water should be valued as a separate factor of production, when the St. Gobain financial statement appears to contain all of the costs associated with production of the Windshields. In addition, Commerce's own determinations, when considered in the aggregate, tend to show that

Commerce typically values material inputs as a separate factor of production only when that input is physically incorporated into the finished product. Because the water at issue is used for cleaning purposes, and is not incorporated into the finished product or specially treated, to include it as a separate factor of production would violate Commerce's own past practice. Thus, on remand, Commerce shall value water as a part of factory overhead or, if it continues to find that water should be valued as a separate factor of production, explain, with specificity, why doing so does not contravene its determinations in Brake Drums and Brake Rotors, Certain Malleable Iron Pipe Fittings, Bicycles, Saccharin, and Sebacic Acid.

III.     "Stores and Spare Parts"

In its Final Determination, Commerce included the line item "stores and spare parts" from St. Gobain's financial statement in factory overhead when calculating the surrogate factory overhead ratio. Commerce found that this line item "is included as a miscellaneous part of overhead, and generally includes indirect materials, and not direct materials consumed in the production process." *Fuyao I*, 27 CIT at __, slip op. 03-169 at 29 (internal citation omitted). Fuyao argued that "since the St. Gobain financial statement's line item 'Cost of Materials Consumed' accounted only for the two main raw materials, float glass and PVB, 'it is obvious from the St. Gobain financial statements that other raw materials [such as mirror buttons, antenna wires, nails, and screws] are included in 'stores and spare parts.'" *Id*. at __, slip op. 03-169 at 28 (internal citation omitted). Thus, Fuyao argued, Commerce's factory overhead ratio was skewed, since it included these other raw materials in factory overhead, while it simultaneously excluded them from the cost of materials consumed. Fuyao explained:

> When calculating the factory overhead ratio, the Department divided Saint Gobain's overhead costs (Depreciation + Stores and Spare Parts + Repairs and Maintenance) by Total Material Costs (Materials + Energy + Labor). . . . However, . . . the overhead costs included the other raw materials while the cost of materials only included the cots [sic] for PVB and float glass. Accordingly, the Department divided an *inflated* total overhead cost(inclusive of other raw materials) by an *understated* total cost of materials (exclusive of the other raw materials), resulting in an artificially higher factory overhead ratio.[9]

*Id.*

The court agreed with Fuyao, saying that "[i]t is not sufficient for Commerce to conclude, without more, that since the stores and spare parts line item generally includes indirect materials, it may not *also* include the additional direct materials at issue here." *Id.* at 31 (emphasis in original). On remand, the court instructed Commerce "to provide an explanation as to where these additional materials are valued in St. Gobain's financial statement, if they are not part of stores and spare parts." *Id.*

In its Remand Results, Commerce explained that its

> best understanding is that stores and spare parts cannot contain

---

[9]       The factory overhead ratio is determined by dividing the total factory overhead expenses by the total material, energy, and labor costs used to produce the subject merchandise in the surrogate country. The resulting surrogate ratio is multiplied by Commerce's calculated factors of production for the surrogate in order to best approximate the overhead expenses that would be incurred by the comparable NME producer. *See* Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the P.R.C., 63 Fed. Reg. 63,842, 63,850 (ITA Nov. 17, 1998) (final results).

> direct materials because stores and spares is a component of
> factory overhead and Indian accounting principles do not permit
> the valuation of direct materials in factory overhead. . . . Thus, any
> material that physically enters into the composition of the finished
> product cannot be a part of factory overhead.

Remand Results at 59, 60. In addition, Commerce further explained that, while these direct materials cannot be part of factory overhead, Commerce cannot precisely locate them in St. Gobain's financial statement because "[i]t is impossible for [Commerce] to further dissect the financial statement of a surrogate company as if the surrogate company were an actual party . . . ." *Id*. at 58. In other words, Commerce cannot state with certainty where these additional direct materials are accounted for in St. Gobain's financial statement, or if they are even used by St. Gobain at all:

> Because Saint Gobain is a surrogate company, [Commerce] does
> not have the precise information required to determine definitively
> whether the other direct materials are valued in the stores and spare
> parts line item or elsewhere in Saint Gobain's financial statement.
> Therefore, by its nature . . . [Commerce's] determination cannot be
> exact. For example, in this case [Commerce] cannot be certain that
> the other direct materials at issue are even used by Saint Gobain for
> the production of . . . windshields.

*Id*. at 59.

Having excluded factory overhead as a possible location for the valuation of these direct materials, Commerce offers two possible alternatives to explain where these materials might be accounted for in St. Gobain's financial statement. First, Commerce examined the financial statement of another Indian producer, Atul Glass Industries Limited ("Atul"), and inferred from its examination that "Atul decided to only report . . . one consumption value for numerous direct

materials, because the other direct materials are so small compared to float glass and PVB that they do not need to be listed individually for the purposes of preparing public financial statements." *Id.* at 61. By likening Atul's financial statement to St. Gobain's, then, Commerce concludes that

> [t]he value of the other direct materials relative to the value of glass and PVB is so small that it is reasonable to presume that the other direct material values are captured in Saint Gobain's raw materials consumed, but that Saint Gobain simply decided not to list the other direct materials separately.

*Id.* at 62. Thus, Commerce concluded that these materials are probably accounted for under "raw materials consumed," but, like Atul, St. Gobain decided not to list these other direct materials separately. Alternatively, Commerce found it possible that St. Gobain did not use these direct materials at all in its production of its windshields, given the lack of record evidence showing otherwise. *See* Def.'s Resp. to Pls.' Comments at 23–24.

Plaintiffs first argue that, by showing where the additional materials are *not* included, Commerce has failed to follow the court's remand instruction to "provide an explanation as to where these additional materials are valued in St. Gobain's financial statement . . . ." *Fuyao I*, 27 CIT at __, slip op. 03-169 at 31. Plaintiffs further argue that Commerce's assumption that the St. Gobain financial statement, like Atul's, likely does not list *all* raw materials, even though it includes them in the cost of materials consumed, is not supported by substantial evidence since

> how Atul Glass reported certain direct materials is not demonstrative of how Saint Gobain might record similar inputs. More important, how Atul Glass recorded certain direct materials is unresponsive to the Court's instruction to Commerce to explain

> why Saint Gobain's stores and spare parts category, in addition to
> indirect materials, might not <u>also</u> include the additional direct
> materials at issue here.

Xinyi's Comments at 34 (emphasis in original).

The court finds that Commerce's determination that "stores and spare parts" does not contain the additional raw materials at issue here is reasonable, given that, in accordance with Indian accounting practices, factory overhead contains indirect materials, not direct materials. *See* Brake Drums, 62 Fed. Reg. at 9,169 ("According to the [Indian] Compendium of Statements and Standards, in order for a material to be considered as part of factory overhead, it must "assist the manufacturing process, but . . . not enter physically into the composition of the finished product."). As Commerce has explained, "[O]ur experience in conducting antidumping reviews leads us to find that the 'stores and spare parts' line item consists of 'equipment and machinery used in the production process,' such as 'tools, grinding wheels, and spare parts' for the equipment and machinery." Remand Results at 43 (quoting Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the P.R.C., 62 Fed. Reg. 6,173, 6182 (ITA Feb. 11, 1997) (final results). In other words, "stores and spare parts" typically contains indirect materials such as the tools and machinery used to produce the subject merchandise, not materials that are incorporated into the merchandise. As a result, the court finds it reasonable for Commerce to conclude that St. Gobain, like Atul, accounted for these raw materials at issue elsewhere, under "raw materials consumed."[10] Thus, the court finds no necessity to exclude stores and spare parts

---

[10]     The court finds, however, that Commerce's alternative possibility—that St. Gobain did not use these additional materials at all—to be unreasonable, as it contravenes

from the numerator in calculating the factory overhead ratio. "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Abbott v. Donovan*, 6 CIT 92, 97, 570 F. Supp. 41, 47 (1983)).

IV.     Commerce's Profit Methodology

In *Fuyao I*, the court determined that, in its calculation of normal value, Commerce reasonably included only positive profit amounts. *See Fuyao I*, 27 CIT at __, slip op. 03-169 at 34. The court, however, questioned whether Commerce had fully considered the directive in 19 U.S.C. § 1677b(e)(2)(B)(iii), which states that the constructed value of imported merchandise "shall be an amount equal to . . . the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, *except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers . . . .*" *Id*. (emphasis added). In its Final Determination, Commerce examined three Indian surrogate companies: St. Gobain, Asahi India Safety Glass Ltd. ("Asahi"), and Atul Glass.

---

Commerce's own conclusion in its Final Determination. *See* Issues and Decision Mem. for the Final Determination, 2002 WL 243660, at Comment 10 ("Direct inputs other than float glass and PVB are almost always included in . . . windshields (ink, mirror buttons, etc).").

However, when calculating normal value, Commerce used the financial statement of only one of those companies, Asahi, because it was the only one with a positive profit. *See* Issues and Decision Mem. for the Final Determination, 2002 WL 243660, at Comment 21 (internal citations omitted).

On remand, the court instructed Commerce to "explain why, given that the Asahi profit amount was the highest profit amount of any Indian company on the record, the use of the Asahi profit figure alone complies with the statute's provisions." *Fuyao I*, 27 CIT at __, slip op. 03-169 at 38. In other words, because, in a market economy country, the statute prevents Commerce from using a profit amount that exceeds that "normally realized" by exporters or producers, Commerce was required to explain why, in constructing its NME methodology, it was proper for it to use the profit figure of the only company on the record with a positive profit.

In its Remand Results, Commerce explained that:

> [I]t is section 1677b(c) of the statute that controls how [Commerce] calculates profit. Section 1677b(e) only applies for purposes of calculating constructed value market economy cases. Therefore, [Commerce's] decision to use only positive profits to calculate a surrogate profit ratio in an NME context does not conflict with section 1677b(e)(2)(B)(iii), as this section does not control [Commerce's] NME methodology.

Remand Results at 69. Commerce further explained that, "[i]n developing its method for valuing profit in NME cases, [Commerce] borrowed a logic contained in section 1677b(e) that 'profit' necessitates a profit figure. However, section 1677b(e) has never controlled the valuation of

profit in NME cases." *Id*. at 70.

Plaintiffs argue that "Commerce believes that it can choose to borrow logic when it wants and choose to disregard logic when it is so inclined." Xinyi's Comments at 38. While recognizing that Commerce is not bound to follow its market economy methodology in the NME context, the court agrees that Commerce has failed to explain why it is reasonable for it to ignore a clear instruction from Congress with respect to constructed value in market economy countries when developing its methodology in NME cases. In its Final Determination, Commerce "borrowed the logic" from 19 U.S.C. § 1677b(e)(2)(A), which deals with market economy countries, to support its finding that the term "profit" should include only positive amounts. In *Fuyao I*, the court found that Commerce's reliance on this statute in an NME context was reasonable. Pursuant to the same statute, however, in a market economy context the profit amount "may not exceed the amount normally realized by exporters or producers . . . ." 19 U.S.C. § 1677b(e)(2)(B)(iii).

In choosing to rely on section 1677b(e) to support its argument with respect to calculating profits, Commerce must comply with the court's directive to take section 1677b(e)(2)(A) "*fully into consideration.*" *Fuyao I*, 27 CIT at __, slip op. 03-169 at 37 (emphasis added). On remand, should Commerce continue to rely on section 1677b(e) only for its definition of profit, while disregarding the statute's other directives concerning profit, it may not merely rely upon the notion that it is not required to conform to the market economy statute; rather, it must explain why that methodology is reasonable in an NME context. *See Pesquera Mares Australes Ltda. v.*

*United States*, 266 F.3d 1372, 1379 (Fed. Cir. 2001) ("*Chevron* deference is afforded to Commerce's statutory interpretations as to the appropriate methodology . . . . ").

V.      Purchase of Traded Goods

In *Fuyao I*, the court noted that both Commerce and Plaintiffs "acknowledge that there is insufficient evidence to determine where expenses associated with the purchase of traded goods[11] are accounted for in St. Gobain's financial statement." *Fuyao I*, 27 CIT at __, slip op. 03-169 at 41. Therefore, on remand, the court instructed Commerce to correct the calculation of the selling, general, and administrative ("SG&A") ratio[12] by either "(1) eliminating expenses relating to the purchase of traded goods from the numerator, (2) including costs relating to the purchase of traded goods in the denominator, or (3) developing some other reasonable method for taking traded goods into account." *Id*.

In its Remand Results, Commerce reexamined the record and determined that the line item "purchase of traded goods" should be included in the denominator of the SG&A ratio. In doing so, Commerce explained that its

---

[11]      "Traded goods" are products that are purchased and then resold by a company. *See Timken Co. v. United States*, 23 CIT 509, 518, 59 F. Supp. 2d 1371, 1379 (1999).

[12]      SG&A are the general expenses related to the cost of manufacturing. *Magnesium Corp. of Am. v. United States*, 20 CIT 1092, 1104, 938 F. Supp. 885, 898 (1996). SG&A includes labor, materials, factory overhead, and energy costs. *See FMC Corp. v. United States*, 27 CIT __, __, slip. op. 03-15 at 4 (Feb. 11, 2003). The SG&A ratio is multiplied by the cost of manufacture in order to obtain the amount of SG&A expenses. *See* Titanium Sponge From the Russian Federation, 64 Fed. Reg. 1599, 1601 (ITA Jan. 11, 1999) (final results).

> regulations direct that, in allocating costs, we "take into account production quantities, relative sales values, and other qualitative and quantitative factors associated with the manufacture and sale of the subject merchandise . . . ." We interpret this regulation to mean making an "apples to apples" comparison (i.e., a comparison of like entities) of the numerator and denominator in the SG&A ratio. Since the surrogate (i.e., Saint Gobain) has selling, general, and administrative expenses for both the cost of manufacturing and the purchase of traded goods in its SG&A, which comprises the numerator of the SG&A ratio, in order to achieve a symmetrical ratio for purposes of this allocation, we have included the purchase of traded goods in the denominator of the SG&A ratio. Therefore, because the surrogate company's expenses associated with the purchase of traded goods cannot be excluded from the numerator of the SG&A ratio . . . we have included the purchase of traded goods in the denominator of the SG&A ratio (i.e., in the cost of goods sold).

Remand Results at 78. The court agrees that Commerce's "apples to apples" comparison is proper in this instance, and infers from Plaintiffs' silence with respect to this issue that they do not dispute Commerce's methodology.

CONCLUSION

Based on the foregoing, the court finds that Commerce's determinations concerning subsidization, valuation of water, and profit methodology are not supported by substantial evidence. On remand, Commerce shall fully comply with the court's instructions herein with respect to these determinations.

Remand results are due within ninety days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments eleven days from their filing. Neither

comments nor replies thereto shall exceed thirty pages in length.


                                                    /s/ Richard K. Eaton
                                              Richard K. Eaton, Judge


Dated: January 25, 2005
          New York, New York