**Slip Op. 03-133**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Judge Judith M. Barzilay**

-------------------------------------------------------------x
                                 :

CHINA NATIONAL MACHINERY
IMPORT & EXPORT CORPORATION,       :

             Plaintiff,      :

         v.             :      Court No. 01-01114

UNITED STATES,               :      **Public Version**

            Defendant,     :

          and         :

THE TIMKEN COMPANY,        :

      Defendant-Intervenor. :

-------------------------------------------------------- x

[United States Department of Commerce antidumping duty remand determination sustained.]

Decided: October 15, 2003

*Crowell & Moring L.L.P., (Jeffrey L. Snyder), Alexander H. Schaefer*, for Plaintiff.

*Peter D. Keisler,* Assistant Attorney General, United States Department of Justice, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, *Patricia M. McCarthy,* Assistant Director, (*Ada E. Bosque*), Trial Attorney; *Amanda L. Blaurock*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for Defendant.

*Stewart and Stewart, Terence P. Stewart, (Wesley K. Caine),* for Defendant-Intervenor.

**OPINION**

**BARZILAY, Judge**: This case is before the court following remand to the United States

Department of Commerce ("Commerce" or "Defendant" or "Department"). In *China National*

*Machinery Import & Export Corp. v. United States*, 27 CIT __, 264 F. Supp. 2d 1229 (2003)

("*CMC I*"), familiarity with which is presumed, the court sustained in part and remanded in part

the Department's determination with respect to Plaintiff China National Machinery Import and

Export Corporation ("CMC" or "Plaintiff") in *Tapered Roller Bearings and Parts Thereof,*

*Finished and Unfinished, from the People's Republic of China; Final Results of 1999-2000*

*Administrative Review, Partial Rescission of Review, and Determination Not to Revoke Order in*

*Part*, 66 Fed. Reg. 57,420 (Nov. 15, 2001) ("*Final Results*").

Plaintiff CMC is an exporter of the subject merchandise, tapered roller bearings

("TRBs"), from the People's Republic of China, a non-market economy ("NME") country. The

dispute involves the prices of a steel input, hot-rolled alloy steel bar, which CMC purchased from

its supplier in [[            ]], a market economy country, and used in the production

of TRBs sold to the United States.[1] In *CMC I*, the court held that, if Commerce had "reason to

believe or suspect" that the supplier's prices were subsidized, Commerce could employ surrogate

values instead of actual prices in normal value ("NV") calculations of dumping margins where it

determines that such prices are best information available under the statute. *See CMC I* at 1238;

*see also* 19 U.S.C. § 1677b(c)(1) (2000) (providing the use of "the best available information"

---

[1] The identity of CMC's supplier [[            ]] and the name of the exporting
country where the supplier is located are confidential, and therefore set in double brackets in the
confidential version of this opinion and deleted from the public version.

concerning the values for factors of production of an exporter in an NME country); H.R. Conf. Rep. No. 100-576, at 590 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623 ("*House Report*") (instructing Commerce to avoid using *any* price "which it has reason to believe or suspect may be dumped or subsidized") (emphasis supplied). In *CMC I*, the court stated that it will "affirm Commerce's actions if, given the entire record as a whole, there is substantial, specific, and objective evidence which could reasonably be interpreted to support a suspicion that the prices CMC paid to its market economy supplier were distorted." *CMC I* at 1240. Applying the standard to the facts of the case, the court found that Commerce did not sufficiently explain and highlight evidence in support of its determinations in the *Final Results*. *Id.* Consequently, the court remanded the case to Commerce to review and augment the administrative record and explain its determinations further. *See id.* at 1243.

Pursuant to the court's order, Commerce issued its *Final Results of Redetermination Pursuant to Remand* (May 13, 2003) ("*Remand Results*"). Plaintiff CMC and Defendant-Intervenor The Timken Company ("Timken") timely responded to the *Remand Results*. In this matter the court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The court must uphold Commerce's determination if it is supported by substantial evidence and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). After reviewing the parties' submissions, the administrative record, and all other papers and proceedings, the court is satisfied that the *Remand Results* are in adequate compliance with the court's order. Accordingly, the court sustains the *Remand Results*.

**I.**

Commerce has a duty to calculate dumping margins as accurately as possible and should typically refrain from using surrogate values (which in themselves are imperfect substitutes) in dumping margin calculations where market-determined values are available. *See Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994). Consistent with this mandate, the applicable regulation advises Commerce to employ actual market values, where available, for NV calculations of an NME exporter, under normal circumstances. *See* 19 C.F.R. § 351.408(c)(1) (2000). On the other hand, as this court pointed out in *CMC I*, Commerce cannot be compelled to use actual prices where it has reason to believe or suspect that such prices are subsidized. *See CMC I* at 1238. The court must look to the facts of record in the case to determine whether Commerce has sufficient reasons to suspect that actual prices are distorted such that the substitution of actual prices with surrogate values is warranted.

The court notes that, until the twelfth administrative review of this antidumping duty order, Commerce employed actual prices paid in its dumping margin calculations. During the twelfth review, Commerce determined that such prices were likely to be distorted by subsidies and should therefore be abandoned in favor of surrogate values. Commerce based its determination on a generally available and countervailable subsidy program in the exporting country, uncovered in countervailing duty investigations from the 1999-2000 period involving subject merchandise other than hot-rolled alloy steel bar and companies other than CMC's supplier. After remand, Commerce supplemented the record with an Office of Policy Memorandum (dated February 2002), which memorializes Commerce's decision to abandon

steel-related factor input prices from the exporting country, as well as two other countries.  In this memorandum, Commerce explains that these countries maintain "broadly available, non-industry specific export subsidies," and adds that, where Commerce already conducted a countervailing duty investigation, "the facts of the underlying investigation must be examined and taken into account."  In the *Remand Results*, Commerce maintains that the exporting country provides "industry specific subsidies and non-industry specific export subsidies."  *Remand Results* at 8.

In *CMC I*, this court articulated three specific grounds in finding Commerce's offered reasons insufficient.  First, neither the subject merchandise in question, nor CMC's supplier was ever specifically investigated in a countervailing duty investigation.  Accordingly, the level of distortion, if any, in the price of hot-rolled alloy steel bar by reason of subsidies was never determined.  Second, in the *Final Results* Commerce relied on an internal confidential memorandum, *Market Economy Steel Memo* (Nov. 7, 2001), as justification for its change of methodology.  The court was concerned that numbers tabulated (without explanation in that memorandum) as the level of subsidies for steel products from the exporting country appeared to be very low.  In other words, it seemed to the court that, even in affirmative countervailing duty determinations for other steel products, the range of subsidy values barely exceeded *de minimis* amounts at the upper limit.  Specifically, [[

]].  Third, one of the countervailing duty investigations from the 1999-2000 period pertaining to the exporting country yielded a negative result.  *See* [[

]].  That is,

Commerce found with respect to the merchandise subject to that investigation that the countervailable subsidy rate was *de minimis*. In sum, the court was reluctant to allow Commerce to choose imprecise surrogate values over actual prices without further justification where evidence of distortion in prices CMC paid to its market economy supplier fell short of substantial, specific evidence.

In the *Remand Results*, Commerce emphasizes that CMC's supplier is a "member of a subsidized industry" and "could have benefitted" from subsidies generally available in the exporting country for exporters of steel products, regardless of the type of product or company, and further emphasizes that such subsidies were specifically found to be utilized by several steel producers.[2] *Remand Results* at 9, 12-13. The existence of these subsidies was confirmed in the Department's 1999-2000 countervailing duty determinations. Commerce offers that there is no evidence in the record that CMC's supplier "was not eligible to participate" in subsidy programs. *Id.* at 14. Commerce points to its long standing agency policy to disregard suspected distorted prices. *Id.* at 9-10. Commerce and Defendant-Intervenor Timken further point out that the company subject to the negative countervailing duty determination constitutes an "anomaly" in that it is the largest steel producer in the exporting country and is government-controlled. *Id.* at 14-15 n.16; *Def.-Intervenor's Rebuttal to Pl.'s Comments on Commerce Dep't's Remand Redetermination* ("*Timken Br.*") at 4; *see also CMC I* at 1240 (dictating Commerce to explain why this producer's case is an anomaly). That company is also known to participate in the

---

[2] In particular, Commerce found that [[

]] *Remand Results* at 12.

subsidy programs as a provider, such as engaging in [[          ]]. Commerce further states that companies that were recipients of the subsidy programs and that were subject to the Department's positive countervailing duty determinations are more representative of CMC's supplier. *Remand Results* at 9.

Commerce explains that it is reasonable to believe that "a market company operating under normal [*i.e.*, competitive] market principles would take advantage of . . . benefits" that are made available to it. *Id.* at 9, 13. Commerce stresses that export subsidy programs in the steel industry of the exporting country were "contingent on a company's export performance" and were not otherwise restricted. *Id.* at 13. Commerce argues that "[u]nless a particular market supplier has been found to have *de minimis* subsidy benefits, . . . the specific level of subsidization is not a relevant consideration in [its] analysis of whether there is reason to believe or suspect that prices may be subsidized." *Id.* at 15.

With respect to level of subsidization, Defendant-Intervenor Timken adds that "[n]othing in the statute or regulation, or even the legislative history, speaks in terms of subsidy *sizes* so far as input values are concerned." *Timken Br.* at 5-6 (emphasis in the original). Timken therefore avers that Commerce's interpretation of which values to use in the calculation of NV in an NME country context is "subject only to reasonableness review."[3] *Id.* at 6. Timken contends that the agency acted reasonably because it "looked to legislative history to construe and administer the statute and regulation." *Id.* As the *House Report* speaks of discarding "any" distorted price,

---

[3] As noted, a preference for market values appears in the Department's regulation. *See* 19 C.F.R. § 351.408(c)(1).

Timken's argument implies that such mandate includes actual prices paid on market.[4]

Plaintiff CMC responds that Commerce's explanations of the *Remand Results* merely consist of "a re-argument of the case based on the same record facts that this Court already found insufficient to justify the initial results." *Pl.'s Comments on the Dep't of Commerce's Proposed Final Results of Redetermination Pursuant to Remand* at 2.  CMC argues that Commerce has failed to address the negative countervailing duty finding that undermines its conclusion. *Id.* at 3.  CMC contends that Commerce failed to specifically link CMC's supplier to any subsidy program. *Id.* at 5.  CMC further points out that the *Remand Results* "also fail to address the *de minimis* issues that the Court raised." *Id.* at 6.  CMC maintains that "Commerce's analysis leads inevitably to a perverse result." *Id.* at 7.  In particular, actual prices charged by an input supplier with a *de minimis* countervailing duty finding would be acceptable while such prices of a supplier with no countervailing duty finding (whether positive or negative) may be disregarded based on findings relating to other suppliers.

The "reason to believe or suspect" standard articulated in the *House Report* by which Commerce's actions must be evaluated establishes a lower threshold than what is required to support a firm conclusion.  The clarification of the standard in *CMC I*, as well as its juxtaposition with the substantial evidence standard in that opinion, does not modify the standard in terms of its demands on the agency. *Cf. Kerr-McGee Chem. Corp. v. United States*, 21 CIT 1353, 985 F. Supp. 1166 (1997) (employing the "reason to believe or suspect" standard).  The court in *CMC I*

---

[4] Timken's arguments to this court additionally contain a criticism of the court's formulation of the "reason to believe or suspect" standard.  However, this court believes that the insistence on specific and objective evidence (even for a "belief" or "suspicion") is an integral part of the substantial evidence analysis.

maintained that the agency's actions are entitled to deference as long as the agency points to substantial, specific, and objective evidence in support of its *suspicion* that the prices are distorted. *CMC I* at 1240 (emphasis added). As Commerce notes in the *Remand Results*, a "reason to believe or suspect requires less evidence than an actual finding of subsidies in fact." *Remand Results* at 6. Moreover, the *House Report* specifically points out that a "formal investigation" is not necessary. *House Report* at 590. The statute further allows Commerce to act given "best available information." 19 U.S.C. § 1677b(c)(1). Therefore, it is clear that Congress provided the agency with ample discretion to disregard suspected distorted prices.

The court finds that the Department's *Remand Results* sufficiently comply with the court's remand order, even though the court acknowledges CMC's argument that Commerce's actions may indeed produce less than ideal results, and the question of whether the suspicion of subsidization at any level should warrant the use of imperfect surrogate values. The *Remand Results* are sufficient in that Commerce further explains the exporting country's subsidy programs, and why one negative countervailing duty determination is immaterial to CMC's case. It also explains why it could not determine CMC's particular subsidy level short of a formal investigation.

Moreover, even though accurate calculation of dumping margins is an overarching goal of the antidumping duty statute, a recent decision from the United States Court of Appeals for the Federal Circuit emphasized that such a goal must necessarily be "within the confines of the statutes, not in derogation of a statutory provision." *Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1377 (Fed. Cir. 2003). Analogously here, Commerce's actions are within the confines of

the statute, the regulation, and the legislative history despite the fact that such actions may produce a less than precisely accurate result. As Timken points out, the statute does not specify a particular level of subsidization at which actual market prices may be discarded. In fact, the statute does not mention market prices. It is only the Department's regulation that mentions and states a preference for market prices.[5]

Under the applicable standard of review, this court may not substitute its judgment for that of the agency as long as the agency's construction of the statute is reasonable. *See Koyo Seiko Co. v. United States,* 36 F.3d 1565, 1570 (Fed. Cir. 1994) (noting that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another") (citation omitted). Furthermore, substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted). Here, Commerce's actions are reasonable because a company like CMC's supplier may have benefitted from a generally available subsidy program given the competitive nature of the industry and by virtue of having engaged in foreign trade. Commerce specifically found that such a program existed and companies like CMC's supplier did indeed utilize the program. Given the level of deference owed to the agency and the low threshold established by the "reason

---

[5] The court notes that an agency is bound by its own regulations. *See United States v. Nixon*, 418 U.S. 683, 694-96 (1974). However, here the Department's actions do not contravene its regulation. The regulation merely dictates that actual prices will be used under normal circumstances. *See* 19 C.F.R. § 351.408(c)(1).

to belief or suspect standard," the court accordingly affirms the *Remand Results.*[6]

## II.

For all the foregoing reasons, the Department's determination in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China; Final Results of 1999-2000 Administrative Review, Partial Rescission of Review, and Determination Not to Revoke Order in Part*, 66 Fed. Reg. 57, 420 (Nov. 15, 2001), as modified by *Final Results of Redetermination Pursuant to Remand* (May 13, 2003), is sustained. A separate judgment will be entered accordingly.

Dated : _____ _____
      New York, New York                              Judith M. Barzilay

---

[6] Plaintiff raised two additional issues in its original papers to the court. In particular, CMC argued that Indonesia was a better surrogate than India and further challenged Commerce's adding of ocean freight and marine insurance costs to price data. In *CMC I*, the court found that these issues were inchoately argued by Plaintiff, and further noted that Commerce's actions, without a forceful argument by Plaintiff to the contrary, were a reasonable exercise of the agency's discretion. *CMC I* at 1238 n.14.