**Slip Op. 07-15**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| ZHEJIANG MACHINERY IMPORT & EXPORT CORP., | : |
| *Plaintiff*, | : |
| v. | : |
| UNITED STATES, | :   Court No. 02-00792 |
| *Defendant*, | : |
| and | : |
| THE TIMKEN COMPANY, | : |
| *Defendant-Intervenor*. | : |

[Plaintiff's Motion for Judgment on the Agency Record is denied; U.S. Department of Commerce's Final Results of Redetermination Pursuant to Remand are sustained.]

Decided: January 29, 2007

Hume & Associates PC (Robert T. Hume and Stephen M. De Luca), for Plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Claudia Burke and Stefan Shaibani); Hardeep Josan and Amanda L. Blaurock, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; for Defendant.

Stewart and Stewart (Terence P. Stewart and Wesley K. Caine), for Defendant-Intervenor.

**OPINION**

RIDGWAY, Judge:

In this action, Plaintiff Zhejiang Machinery Import & Export Corporation ("ZMC"), a

Chinese exporter of tapered roller bearings ("TRBs"), contests the Final Results of Redetermination Pursuant to Remand in the U.S. Department of Commerce's 14th administrative review of the antidumping duty order on TRBs from China ("TRB XIV").[1] ZMC challenges both the Commerce Department's "subsidy suspicion" policy in general, and its application to ZMC in the administrative review at issue. Pursuant to that policy, the agency calculated ZMC's dumping margin using surrogate prices for steel inputs, rather than the actual prices that ZMC paid to its supplier, which is located in a market economy country. *See* Memorandum of Points and Authorities in Support of Motion of Plaintiff Zhejiang Machinery Import & Export Corp. for Judgment on the Agency Record ("Pl.'s Brief") at 5-6; Comments of Plaintiff on Final Results Pursuant to Remand ("Pl.'s Remand Comments") at 14-15.

Pending before the Court is Plaintiff's Motion for Judgment on the Agency Record, in which ZMC urges that this matter be remanded to the agency with instructions to recalculate ZMC's dumping margin using the actual prices that ZMC paid its market-economy steel supplier. *See generally* Pl.'s Brief; Pl.'s Remand Comments; Plaintiff's Comments on Defendant's Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("Pl.'s Reply Brief"); Plaintiff's Supplemental Brief ("Pl.'s Supp. Brief").

ZMC's motion is opposed by the Government and by Defendant-Intervenor, The Timken

---

[1]*See* Final Results of Redetermination Pursuant to Remand ("Remand Results"); *see also* Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of 2000-2001 Administrative Review, Partial Rescission of Review, and Determination to Revoke Order, in Part, 67 Fed. Reg. 68,990 (Nov. 6, 2002) ("Final Results"); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China: Amended Final Results of 2000-2001 Administrative Review, 67 Fed. Reg. 72,149 (Dec. 4, 2002).

Company, who maintain that the Commerce Department's determination is supported by substantial

evidence and is otherwise in accordance with law, and therefore should be sustained in all respects.

*See generally* Defendant's Memorandum in Opposition to Plaintiff's Rule 56.2 Motion for Judgment

Upon the Agency Record ("Def.'s Brief"); Defendant's Supplemental Brief ("Def.'s Supp. Brief");

Opposition of the Timken Company, Defendant-Intervenor, to the Motion of Zhejiang Machinery

Import & Export Corp., Plaintiff, for Judgment upon the Agency Record ("Def.-Int.'s Brief"); The

Timken Company's Supplemental Brief ("Def.-Int.'s Supp. Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[2] For the reasons set forth below, ZMC's

Motion for Judgment on the Agency Record is denied, and the Final Results of Redetermination

Pursuant to Remand are sustained.

## I.  Background

This case involves the 14th administrative review of the antidumping order covering TRBs

from China ("TRBs XIV"),[3] in which the Department of Commerce reviewed, *inter alia*, ZMC's sale

of TRBs for export to the United States.  *See* Pl.'s Brief at 4.

In the administrative review, Commerce treated China as a non-market economy ("NME"),[4]

---

[2]All statutory citations herein are to the 2000 edition of the U.S. Code.

Similarly, all citations to regulations are to the 2001 edition of the Code of Federal Regulations.  The pertinent text of the provision cited  remained the same at all times relevant here.

[3]Commerce's antidumping order on TRBs from China dates back to 1987.  *See* Tapered Roller Bearings from the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 52 Fed. Reg. 19,748 (May 27, 1987).  The 14th administrative review covers sales from June 1, 2000 through May 31, 2001.  *See* Final Results.

[4]A NME country is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not

and selected India as its surrogate market-economy country.[5]  *See* Pl.'s Brief at 9; Def.'s Brief at 3; Def.-Int.'s Brief at 4-5.  No party objected to Commerce's choice of India as the surrogate.

In the course of the proceedings, ZMC informed Commerce that it had purchased certain steel inputs at market price from a company located in a market economy.  *See* Pl.'s Brief at 3-4; Def.-Int.'s Brief at 5.  However, when Commerce issued its preliminary results, it used surrogate data, rather than the market-price-steel-input data provided by ZMC.  Commerce justified its rejection of ZMC's market prices based on the agency's "subsidy suspicion policy," finding that there was "reason to believe or suspect" that the prices for the input in question may have been subsidized.  *See* Pl.'s Brief at 4-5; Def.'s Brief at 4-6; Def.-Int.'s Brief at 8.  Although ZMC objected to the use of surrogate prices in lieu of the market prices paid the inputs in question, Commerce made no change in the Final Results.  *See* Pl.'s Brief at 4; Final Results; Def.'s Brief at 4-6.[6]

ZMC timely filed this action in the Court "challenging Commerce's determination to reject actual market-economy prices for steel used to make TRBs."  Pl.'s Brief at 5; Complaint ¶6.  In light of developments in litigation involving the 13th administrative review of TRBs from China ("TRBs XIII"), the Government sought – and the Court granted – a  voluntary remand to allow agency "to provide a more thorough explanation of its determination" in the proceeding at issue here.

---

reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A) (1999).

[5]The statute directs Commerce on how to determine NV for a NME country.  *See* 19 U.S.C. § 1677b(c).  As part of this process Commerce selects an appropriate surrogate country to aid it in calculating NV.  *Id.*

[6]The Final Results were subsequently amended to correct ministerial errors.  However, those changes are irrelevant here.

Following the filing of Commerce's Remand Results, and full briefing by the parties, this matter is ripe for review.

## II. <u>Analysis</u>

ZMC advances two primary claims in this action. ZMC first mounts a full frontal attack on the Commerce Department's "subsidy suspicion" policy, alleging that it is inconsistent with the applicable statute and regulation. In addition to that challenge to the policy in principle, ZMC also disputes Commerce's application of the policy to the facts of this case. Specifically, ZMC contends that Commerce erred in rejecting the prices it paid to its market economy supplier of steel. In addition to its two main issues, ZMC also raises a handful of other arguments. As discussed in greater detail below, however, ZMC's claims are unavailing.

### A. <u>The Policy's Consistency With The Applicable Statute and Regulations</u>

The antidumping statute requires Commerce to use "the best available information" on the values for factors of production from a market economy in calculating the Normal Value ("NV") for products exported from an NME country. 19 U.S.C. § 1677b(c)(1). ZMC contends that the statutory mandate to use the best available information requires the agency to value factors of production using actual prices paid to market economy suppliers, whenever available. *See generally* Pl.'s Brief at 8-10.

To support its position, ZMC invokes <u>Lasko</u>, which concluded that – where it can be determined that an NME producer's input prices are market determined – "accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law." *See* Pl.'s Brief at 11

(*quoting* <u>Lasko Metal Prods., Inc. v. United States</u>, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).  ZMC's reliance on <u>Lasko</u> is misplaced.

Contrary to ZMC's implication, <u>Lasko</u> does not mandate the use of market prices.  Instead, it simply sustained Commerce's use of market prices under the specific circumstances of that case, where the agency found market prices to be the best available information.  As <u>Lasko</u> emphasized, Commerce's overarching duty under the antidumping statute is "to determine margins as accurately as possible, and to use the best information available to it in doing so."  <u>Lasko</u>, 43 F.3d at 1443.  The statute "simply does not say – anywhere – that the factors of production must be ascertained in a single fashion."  <u>Lasko</u>, 43 F.3d at 1446.  *See generally* Def.'s Brief at 10-12; Def.-Int.'s Brief at 5-7, 16-18.

In short, nothing about Commerce's subsidy suspicion policy is inherently incompatible with the antidumping statute.  Indeed, the policy is designed to further the purposes of the statute, by ascertaining dumping margins as accurately as possible.  *See generally* <u>Luoyang Bearing Corp., et al v. United States</u>, 28 CIT __, __, 2004 WL 1146101 *10-11 (2004); <u>Fuyao Glass Indus. Group Co., et al. v United States</u>, 27 CIT 1892,1901 (2003) ("<u>Fuyao I</u>"); <u>Peer Bearing Co.-Changshan v. United States</u>, 27 CIT 1763, 1769-71, 298 F. Supp. 2d 1328,1334-36 (2003); <u>China Nat'l Mach. Import & Export Co. v. United States</u>, 27 CIT 255, 261-63, 264 F. Supp. 2d 1229,1236 (2003) ("<u>China Nat'l I</u>") (all rejecting argument that subsidy suspicion policy is inconsistent with statute).

ZMC also contends that the Commerce Department's subsidy suspicion policy contravenes the agency's own regulations, which – according to ZMC – compel the use of actual market prices over surrogate values.  ZMC points to 19 C.F.R. § 351.408(c)(1), which provides that "where a

factor is purchased from a market economy supplier and paid for in a market economy currency, [the Commerce Department] normally will use the price paid to the market economy supplier." *See* Pl.'s Brief at 9-10.

The language of § 351.408(c)(1) itself refutes ZMC's claim. The regulation merely states a general rule; the word "normally" hedges the text, and indicates that there are exceptions to the general principle set forth there. In effect, ZMC would read the word "normally" right out of the text. *See generally* Def.'s Brief at 17-21; Def.-Int's Brief at 17. Thus, as other "subsidy suspicion" cases have confirmed, nothing about the subsidy suspicion policy conflicts with § 351.408(c)(1). *See generally* China Nat'l I, 27 CIT at 264-65, 264 F. Supp. 2d at 1237; Peer Bearing, 27 CIT 1769-71, 298 F. Supp. 2d at 1334-36 (all rejecting argument that subsidy suspicion policy conflicts with regulation).

Indeed, Commerce forged its subsidy suspicion policy as an exception to (or a departure from) the "normal" rule set forth in § 351.408(c)(1), for the express purpose of conforming to Congressional intent as reflected in the legislative history of the antidumping statute. Specifically, the legislative history of 19 U.S.C. § 1677b(c) directs the Commerce Department to avoid using – in its NME "normal value" calculations – "any prices" which the agency "has reason to believe or suspect may be dumped or subsidized prices." *See* H.R. Rep. 100-576, Vol. 4, at 590-91 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24 ("Conference Report"). *See generally* Def.'s Brief at 15-16; Def.-Int's Brief at 17-18.

ZMC takes strong exception to Commerce's reliance on the Conference Report. ZMC correctly notes that, read in context, the quoted language refers to the use of surrogate values to

determine NV in the NME context, and does not address the selection of surrogate values over market prices. *See* Pl.'s Brief at 20-21. As Fuyao I notes, however, that "does not, in turn, mean that Congress's *instructions* . . . cannot be used by Commerce when constructing its methodology with respect to market economy purchases. . . . Commerce is fully justified in relying on those instructions to establish the reasonableness of its methodology in an NME situation." Fuyao I, 27 CIT at 1900 (rejecting same argument advanced by ZMC here). "[T]he use of suspect prices to calculate NV, even when paid to a market-economy supplier, would be contrary to Congress' intent." Peer Bearing, 27 CIT at 1769, 298 F. Supp. 2d at 1334. *See also* China Nat'l I, 27 CIT at 265, 264 F. Supp. 2d at 1237-38; Fuyao I, 27 CIT at 1899-1901 (all recognizing Conference Report as justification for subsidy suspicion policy).

## B.  The Application of the Policy to the Facts of This Case

Besides challenging Commerce's subsidy suspicion challenge in principle, ZMC also contests the application of the policy to ZMC in the administrative review at issue here. *See generally* Pl.'s Brief at 1-2; *see also* Pl's Brief at 16-19; Pl.'s Remand Comments at 3; Pl.'s Reply at 4-7.

Contrary to ZMC's claims, however, there is ample record evidence to support Commerce's conclusion that there is "reason to believe or suspect that ZMC's supplier may have benefitted" from subsidies, as set forth more fully below. *See* Remand Results at 15; *see generally* Def.'s Brief at 26-36; Def.-Int.'s Brief at 19-25.

Commerce based its conclusion principally on its analyses of a number of recent countervailing duty cases in which it investigated a wide variety of steel products produced in the

country where ZMC's supplier is located.  *See* Remand Results at 5-6 (listing subsidy programs).[7]

---

[7]In addition to the records of the various countervailing duty cases, Commerce also relied on the so-called "Market Economy Steel Memo" (dated November 6, 2002), a January 2001 memorandum on Allegations of Unfair Steel Prices, and a February 2002 Office of Policy Memorandum.  *See* Remand Results at 9-10 & n14 & App. I.

The Market Economy Steel Memo simply transmits into the record of this case the memo on Allegations of Unfair Steel Prices.  That memo, in turn, reflects an analysis of subsidies provided by the government at issue to producers of certain steel products in that country, prepared by Commerce in the course of the TRBs XII proceeding.  The memo summarizes Commerce's rationale for its conclusion that some of the determinations may have greater implications, providing reason to believe or suspect that the government subsidizes steel products in addition to those expressly covered by the determinations:

> Although the most recent findings do not cover the specific products we need to value, these findings may have broader implications for steel products produced in [the country in question], as discussed in the Issues and Decision Memo in this review. . . .

> *        *        *        *

> The subsidies investigated in these three cases can be divided into two groups: general subsidies that appear to be available to and used by more than one steel producer and company-specific subsidies. . . .

Referring to the subsidies generally available to steel producers, the memo continues:

> Because these subsidies do not appear to be company-specific and because they have been calculated using recent information, we recommend finding that there is reason to believe or suspect that the prices for steel produced by [a certain producer] are subsidized.

Memorandum on Allegations of Unfair Steel Prices.  Commerce followed the memo's recommendation in TRBs XII, and relied on it once again in TRBs XIII.  *See* Def.-Int.'s Brief at 20-21; China Nat'l Mach. Import & Export Corp. v. United States, 27 CIT 1553, 1555, 293 F. Supp. 2d 1334, 1336-37 (2003) ("China Nat'l II"), *aff'd*, 104 Fed. Appx. 183 (not cited for precedent) (noting Commerce's reliance on Market Economy Steel Memo/Memo on Allegations of Unfair Steel Prices in TRBs XIII).  Commerce's analysis in the case at bar included two additional CVD cases published since the Market Economy Steel Memo.  *See* Remand Results at 10.

The more recent Office of Policy Memorandum advises that, for all non-market economy

Commerce's analyses of those cases ("the 1999-2002 cases") determined that the government in question maintains a range of both (steel) industry-specific subsidy programs and non-industry specific export subsidy programs. *See* Remand Results at 6-7, 10-13.[8] Commerce further determined that both the industry-specific subsidy programs and the export subsidy programs were in fact actually being used by steel producers, and were available to all in the industry. *See* Remand Results at 11.[9] Thus, the programs were not limited to certain steel companies, or to particular types of steel. *See* Remand Results at 11-12. And Commerce found no record evidence from which it might infer that ZMC's supplier would not be eligible to participate in the various subsidy programs. *See* Remand Results at 13.

Based on its analyses of both the various industry-specific programs and the various export subsidy programs, Commerce found that ZMC's supplier had a range of subsidies available to it, and that there were a number of them from which the supplier – as an exporter and as a member of the subsidized industry – could have benefitted. *See* Remand Results at 7-8.

---

investigations, factor input prices from three countries (including the country in which ZMC's supplier is located) should be disregarded – whether they are market economy purchases or import statistics into the surrogate country – due to the fact that those countries maintain broadly available, non-industry specific export subsidies. *See* Remand Results at 9-10 & App. I; China Nat'l II, 27 CIT at 1555, 293 F. Supp. 2d at 1336, *aff'd*, 104 Fed. Appx. 183 (not cited for precedent) (noting Commerce's reliance on Office of Policy Memorandum, post-remand, in TRBs XIII).

[8]In its analysis, Commerce specifically excluded all company-specific and regional subsidy programs. *See* Remand Results at 11-12.

[9]Indeed, Commerce found that the export subsidy programs at issue were "broadly available and not industry specific" nor limited to particular types of merchandise, but were instead "contingent on a company's export performance." *See* Remand Results at 11-13.

Moreover, based on its review, Commerce found it reasonable to infer that "a market company operating under normal market principles would take advantage of those benefits," and further, that "given the competitive environment in which ZMC's supplier operates, it is reasonable to infer that it would have taken advantage of these programs." *See* Remand Results at 8, 12. Certainly there is no affirmative evidence in the record to establish that ZMC's supplier did not avail itself of any of the various subsidies.

As Timken observes, the record in this proceeding "contain[s] much of the same evidence" included in the record in TRBs XIII. *See* Def.-Int.'s Brief at 24-25. ZMC offers no sound reason why the same result should not obtain here:

> Commerce's actions [in rejecting ZMC's price data in favor of surrogate values] are reasonable because a company like [ZMC's] supplier may have benefitted from a generally available subsidy program given the competitive nature of the industry and by virtue of having engaged in foreign trade. Commerce specifically found that such . . . program[s] existed and companies like [ZMC's] supplier did indeed utilize the program[s]. Given the level of deference owed to the agency and the low threshold established by the "reason to believe or suspect standard," . . . [Commerce's Remand Results must be sustained].

*See* China Nat'l II, 27 CIT at 1558-59, 293 F. Supp. 2d at 1339, *aff'd*, 104 Fed. Appx. 183 (not cited for precedent) (sustaining Commerce's application of subsidy suspicion policy in TRBs XIII); *see also* Peer Bearing, 27 CIT at 1771-73, 298 F. Supp. 2d at 1336-38 (sustaining agency's application of subsidy suspicion policy in TRBs New Shipper Review for 2000-2001); Luoyang, 28 CIT __, 2004 WL 1146101 at *12 (sustaining agency's application of subsidy suspicion policy in TRBs XII).[10]

---

[10]In Fuyao II, the court advanced a three-prong test for Commerce's invocation of the subsidy suspicion policy. Specifically, Fuyao II would require that the agency "demonstrate by specific and objective evidence that (1) subsidies of the industry in question existed in the supplier

------------------------

countries during the period of investigation ('POI'); (2) the supplier in question is a member of the subsidized industry or otherwise could have taken advantage of any available subsidies; and (3) it would have been unnatural for a supplier to not have taken advantage of such subsidies." *See* Fuyao Glass Indus. Group Co., et al. v. United States, 29 CIT __, 2005 WL 280437 *4 (2005) ("Fuyao II").

In its supplemental brief in this action, ZMC seeks to apply the Fuyao II test to the record here. *See generally* Pl.'s Supp. Brief at 5-8. As a threshold matter, Fuyao II postdates the close of the record in this action. Commerce therefore had no opportunity to develop and frame the evidence in the record of this case in terms of the three prongs of the Fuyao II test. It is similarly noteworthy that the test has generated some controversy, which has yet to be resolved. *See generally* Fuyao Glass Indus. Group Co., et al. v. United States, 30 CIT ____, 2006 WL 345004 ("Fuyao III").

Most important here, however, is the fact that ZMC never objected to Commerce's analysis in this case on the grounds reflected in the Fuyao II test – either at the administrative level or in this litigation – until ZMC filed supplemental brief. In particular, for example, although ZMC had previously argued that certain subsidy programs had been terminated (and therefore should not be relied upon by Commerce), ZMC had never before argued that Commerce could rely only on "subsidies . . . during the period of investigation" at issue. ZMC's eleventh hour attempt to inject this new issue into this action effectively ambushes the other parties, and is therefore likely barred by the doctrine of exhaustion of administrative remedies.

Even if ZMC's argument were not barred, it appears that it would fail. ZMC's only arguments vis-a-vis the second and third prongs of Fuyao II are – respectively – its claims that Commerce never investigated its supplier or the product at issue, and its claim that one of the cases that Commerce cites yielded a negative finding as to one producer. *See* Pl.'s Supp. Brief at 7-8. Those arguments lack merit, for reasons detailed elsewhere below.

As to the first prong, ZMC asserts that Commerce "heavily relies on many . . . [d]eterminations that do not correspond to the period of review," and contends that – when those determinations are excluded – all that remains is "information contained in two Federal Register Notices" of the results of recent countervailing duty investigations. As to that information, ZMC asserts simply that it does not "reach the threshold set in Fuyao and should be discarded." *See* Pl.'s Supp. Brief at 6-7.

First, it is far from clear that ZMC's characterization of the temporality of the countervailing duty determinations (other than the Federal Register notices) is fully accurate. It is not clear, for example, that ZMC considered the extent to which those other determinations may contain evidence of a continuing stream of benefits. *Cf.* n.11, *infra* (explaining that even the *termination* of a subsidy program does not necessarily stop the flow of benefits).

But, even assuming *arguendo* that the other determinations offer not even a scintilla of evidence on which Commerce could rely under the Fuyao II test, the two Federal Register notices still remain; and they cannot be rejected as dismissively as ZMC suggests. ZMC notably does not state – much less prove – that the information contained therein is unreliable. ZMC doesn't even explain what Fuyao threshold it is referring to, or in what specific way it believes the information to be deficient. And even the two Federal Register notices alone could suffice to establish the existence of subsidies sufficient to justify Commerce's invocation of the subsidy suspicion policy.

Finally, apart from the issue of the Fuyao II test discussed above, it is important to note more generally that the evidence on which Commerce relied here was quantitatively and qualitatively different – stronger – than the evidence found lacking in Fuyao. As Timken notes, the subsidies documented in this case "are comparable to the ones that the [Fuyao] Court approved after the first remand, and are unlike the ones the [Fuyao] Court found insufficient" to justify application of Commerce's subsidy suspicion policy. *See* Def.-Int.'s Supp. Brief at 8-9. Specifically, Timken explains:

> Here, Commerce looked to published notices of Countervailing Duty Orders applicable to the steel industry in the market country in question, and those Orders in turn were supported by findings in the administrative reviews that steel producers in that country in fact received the subsidies in question. . . . That evidence contrasts with the evidence rejected in Fuyao Glass. . . .
>
> . . . Fuyao Glass sustained Commerce when it was satisfied that the agency had relied on the same basic kind of evidence found acceptable in [China Nat'l II] – *that is*, *the same basic kind of evidence that Commerce relied on in the instant case*. Specifically Commerce here relied on evidence indicating that the country in question subsidized its *steel industry and the country's exports of steel*. . . . Commerce then applied common sense and formulated a belief or suspicion that the steel exporter(s) involved in this case may have taken advantage of the existing programs – as had other steel producers. As the agency stated in the Final Results of the Redetermination Pursuant to Court Remand . . . :
>
>> Through these CVD proceedings [relied upon for the suspicion or belief], the Department established the existence of broadly-available export subsidies and industry-specific subsidies from which ZMC's supplier, an exporter and member of the subsidized industry, could have benefitted.
>
> [Remand Results at 7.] This language is nearly identical to the language in the [China Nat'l] Redetermination, which the Court approved in [China Nat'l II], and which the Court adopted in Fuyao II.

As discussed below, none of ZMC's arguments casts doubt on either the correctness of Commerce's decision to apply its subsidy suspicion policy here, or the existence of substantial evidence in the record to support that decision.

ZMC first charges that the administrative record lacks "particularized evidence" that its supplier's prices were subsidized, and dismisses the Commerce Department's case as purely "circumstantial." *See*, *e.g.*, Pl.'s Brief at 1-2; Pl.'s Remand Comments at 6-7. ZMC emphasizes that the agency has proffered no proof that ZMC's supplier actually received any subsidy. *See* Pl.'s Remand Comments at 6-7; Pl.'s Reply Brief at 4. Nor has Commerce identified a specific subsidy program from which it believes ZMC's supplier benefitted. *See* Pl.'s Brief at 5; Pl.'s Remand Comments at 4; Pl.'s Reply Brief at 3. ZMC also seeks to make much of the fact that neither its supplier nor the product at issue is the subject of an order. *See* Pl.'s Brief at 5, 11; Pl.'s Remand Comments at 4; Pl.'s Reply Brief at 3. Moreover, neither its supplier nor the product at issue has been investigated. *See* Pl.'s Brief at 1-2, 15, 17-18. ZMC maintains that without "particularized," objective evidence that its supplier's prices may be subsidized, Commerce is obligated to use market prices rather than surrogate values in its calculations. *See*, *e.g.*, Pl.'s Brief at 6, 11, 14, 18-19; Pl.'s Remand Comments at 3-4.

ZMC's arguments are a thinly-veiled collateral attack on the fundamental premise of the subsidy suspicion policy. In effect, ZMC contends that the "reason to believe or suspect" standard is satisfied only when there is conclusive evidence that a supplier's merchandise is, in fact, subsidized. But any such claim is refuted by the legislative history of the statute, which makes it

---

Def.-Int.'s Brief at 8-10.

clear that Congress did not intend to require Commerce to conduct formal investigations in situations like this, and did not intend Commerce to definitively determine whether prices actually *are* subsidized. *See* Conference Report (stating that, in valuing factors of production, Commerce is to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized," and emphasizing that "the conferees do not intend for Commerce to conduct a formal investigation to ensure that . . . prices are not dumped or subsidized, but rather intend that Commerce base its decision on information generally available to it at that time").

The "reason to believe or suspect" standard is thus a relatively "low threshold" – less demanding than ZMC suggests, and clearly less rigorous than required for an actual finding of subsidies in fact. *See* China Nat'l II, 27 CIT at 1558-59, 293 F. Supp. 2d at 1338-39, *aff'd*,104 Fed. Appx. 183 (not cite for precedent) (noting "the low threshold established by the 'reason to believe or suspect' standard" and that it is "a lower threshold than what is required to support a firm conclusion"); Remand Results at 4, 19-20. *See also* China Nat'l II, 27 CIT at 1555-57, 1559, 293 F. Supp. 2d at 1336-37, 1339, *aff'd*, 104 Fed. Appx. 183 (not cited for precedent) (sustaining application of subsidy suspicion policy, even though "neither the subject merchandise in question, nor [respondent's] supplier was ever specifically investigated" and even though "the level of distortion, if any, in the price of [the product at issue] by reason of subsidies was never determined"); China Nat'l I, 27 CIT at 267-68, 264 F. Supp. 2d at 1240 (acknowledging respondent's claim that "there are no current or prior countervailing duty orders . . . on the material input in question"); Peer Bearing, 27 CIT at 1772 n.4, 298 F. Supp. 2d at 1337 n.4.; Luoyang, 28 CIT __, 2004 WL 1146101 at *11-13.

ZMC also tries to undermine the theoretical underpinnings for the application of the subsidy suspicion policy in this case, by pointing out that, in one recent investigation of a steel product in the country at issue, Commerce made a negative final determination. ZMC intimates that this negative determination weighs heavily against the premise that there are industry-wide subsidies conferring benefits on all manufacturers of steel products in the subject country. *See* Pl.'s Brief at 1-2, 11-12, 14-15; Pl.'s Remand Comments at 2-3; *see also* China Nat'l I, 27 CIT at 268, 264 F. Supp. 2d at 1240-41. However, as the Remand Results here note (and as China Nat'l II recognized), the determination on which ZMC relies is anomalous – readily explained, and "immaterial" to application of the subsidy suspicion policy to the country in question. *See* Remand Results at 13-14; China Nat'l II, 27 CIT at 1555-57, 293 F. Supp. 2d at 1336-38, *aff'd*, 104 Fed. Appx. 183 (not cited for precedent); Def.'s Brief at 38-39; Def.-Int.'s Brief at 30-31.

ZMC fares no better on its claim that many of the countervailing duty determinations cited by Commerce found only *de minimis* levels of subsidization, and therefore (according to ZMC) cannot be used to justify application of the subsidy suspicion policy here. *See generally* Pl.'s Brief at 1-2, 5, 13,16-18; Pl.'s Remand Comments at 2-4, 7-10; Pl.'s Reply Brief at 3; *but see* Remand Results at 13-15, 20-21 (responding to ZMC's claim). "The statute does not specify a particular level of subsidization at which actual market prices may be discarded." China Nat'l II, 27 CIT at 1554-59, 293 F. Supp. 2d at 1336-39, *aff'd*, 104 Fed. Appx. 183 (not cited for precedent).

It is thus well-settled that "[t]he level of subsidization does not prevent Commerce from determining that it has 'reason to believe or suspect' that prices paid are subsidized. *Any level of subsidization* found in the exporting country is enough evidence to support a determination that

Commerce has 'reason to believe or suspect' that prices are distorted." Peer Bearings, 27 CIT at

1771-72, 298 F. Supp. 2d at 1337 (emphasis added); *see also* China Nat'l II, 27 CIT at 1554-59, 293

F. Supp. 2d at 1336-39, *aff'd*, 104 Fed. Appx. 183 (not cited for precedent); Fuyao II, 29 CIT at

____, 2005 WL 280437 at *7-9 (*quoting* Peer Bearing).[11]

### C. ZMC's Remaining Arguments

ZMC's few remaining arguments make short work.

ZMC criticizes the Commerce Department's subsidy suspicion policy as opaque, and asserts

that the agency is obligated to issue "memorialized guidance" or to promulgate a regulation on the

subject for the benefit of the trade community. *See*, *e.g.*, Pl.'s Brief at 20; Pl.'s Remand Comments

at 3, 14; Pl.'s Reply Brief at 3, 8; *see also* Remand Results at 21 (*quoting* question posed by ZMC

in its comments on the Draft Remand Results). According to ZMC, "[t]he failure to articulate a

clear standard for finding a reason to believe or suspect prices may be dumped or subsidized . . . has

led to confusion for respondents in NME antidumping cases and thus denies them fundamental

fairness and predictability." Pl.'s Brief at 20, 22.

ZMC emphasizes that Commerce promulgated a regulation expressing its preference for

market prices a decade ago (19 C.F.R. § 351.408(c)(1)), and observes that Commerce also has "a

---

[11]ZMC similarly claims that certain subsidy programs cited by Commerce have been "terminated" or "discontinued." *See* Pl.'s Brief at 1-2, 16-17. As Timken notes, however, there is no indication that ZMC put that information on the record of this proceeding. *See generally* Def.-Int.'s Brief at 30-31. In any event, the termination of a program does not necessarily stop the flow of all benefits. *Id*. Indeed, according to Timken, information available elsewhere indicates that at least some of the assertedly terminated programs were still conferring benefits during the Period of Investigation at issue here, and – moreover – that benefits from at least one of those programs may continue to flow years into the future. *Id*.

policy statement on the standard for finding reason to believe or suspect a respondent's prices may be sold below the cost of production and thus provide the basis for conducting a cost of production ('COP') inquiry." ZMC maintains that something similar is required to document the agency's subsidy suspicion policy and its "reason to believe or suspect" standard. *See* Pl.'s Brief at 20 n.68 (*citing* Import Administration Policy Bulletin No. 94.1, Cost of Production – Standards for Initiation of Inquiry (March 25, 1994)); Pl.'s Remand Comments at 14; Pl.'s Reply Brief at 3, 8.

However, ZMC cites no legal authority for its claim that Commerce is required to promulgate a regulation. And, as the Government notes, the absence of such a regulation or guidance in no way undermines Commerce's reading of 19 U.S.C. § 1677b(c) and 19 C.F.R. § 351.408(c)(1) "as not requiring a finding of subsidies in fact in order for Commerce to have reason to believe or suspect that market prices may be subsidized." *See* Def.'s Brief at 42.

Indeed, as the Government points out, Commerce has construed the relevant statute and regulation in its February 2002 Office of Policy Memorandum (discussed in note 7 above), "which neither requires Commerce to conduct a formal investigation nor obligates Commerce to uncover subsidies in fact in order to have reason to believe or suspect that a particular supplier's prices may be subsidized." *See* Def.'s Brief at 42-43. The Government concludes that – contrary to ZMC's assertions – both Commerce's interpretation and its implementation of its subsidy suspicion policy are reasonable and fully consistent with the express language and history of the statute, as well as the regulation. *See* Def.'s Brief at 19-20.

ZMC also characterizes the subsidy suspicion policy as "arbitrary and capricious," complaining that Commerce has "created a nearly impossible standard for respondents to meet in

order to refute any suspicion that their suppliers' prices may be subsidized." *See* Pl.'s Brief at 6, 22-24; Pl.'s Remand Comments at 5. ZMC explains that, in another antidumping investigation involving China, Commerce found that respondents overcame any suspicion that their suppliers' prices were subsidized, because those suppliers had been previously investigated by Commerce and had been found not to be receiving subsidies above a *de minimis* levels. *See* Pl.'s Brief at 6. ZMC asserts that, because its supplier has never been investigated, ZMC cannot prove that it does not benefit from subsidies. *Id.*; *see also* Pl.'s Remand Comments at 10 ("absent being 'cleansed' through an investigation, Commerce provides no explicit means for an interested party to show its market economy supplier received no subsidy"). Contrary to ZMC's claim, however, Commerce has expressly recognized that, other than being the subject of an investigation, "there may be additional means of rebutting the presumption" that a supplier's prices are subsidized or dumped. *See* Remand Results at 20. "[W]here there is evidence which counters the Department's presumption parties may bring it to the Department's attention." *Id.* Such evidence might include proof "that the prices paid were market-determined, for example," or "credible evidence that the supplier did not participate in any subsidies programs." Peer Bearing, 27 CIT at 1772 n.5, 298 F. Supp. 2d at 1337 n.5. Optimally, the evidence would include "financial data" and "other information indicating that the supplier's prices were not subsidized." Peer Bearing, 27 CIT at 1772-73, 298 F. Supp. 2d at 1337.

Indeed, in the instant case, ZMC had an opportunity during the administrative review to rebut the presumption that its supplier was subsidized by the subject government. ZMC could have proffered evidence to establish that its supplier's steel is not subsidized. Commerce would have

accepted and considered it. But ZMC elected not to avail itself of the opportunity, and therefore cannot now be heard to complain. *See generally* Def.'s Brief at 41-42.

### D. ZMC's Challenge to the Validity of Surrogate Values for "Scrap"

ZMC quite belatedly attempts to inject one final issue into this litigation, unrelated to its challenge to the Commerce Department's use of the subsidy suspicion policy to reject the actual prices that ZMC paid for steel inputs to its market economy supplier (discussed above). In its comments to Commerce on the Draft Remand Results, ZMC – for the very first time – questioned the validity of the *surrogate values* for *scrap* used in the agency's calculations. *See* Remand Results at 18-19 (*quoting* questions posed by ZMC in its comments on Draft Remand Results).

Cloaked as an issue of the "selective application" of the subsidy suspicion policy, ZMC argues that Commerce applies the subsidy suspicion policy to some countries, but not others. ZMC apparently faults Commerce in this case for not rejecting certain values of U.S. exports to India which were allegedly subsidized. *See generally* Pl.'s Remand Comments at 10-12; Pl.'s Reply Brief at 2-3, 4-7.

As ZMC concedes, however, Commerce did not consider this issue in TRBs XIV because no one involved in the administrative review at the agency level – including ZMC itself – questioned the integrity of the Indian statistics. *See* Pl.'s Remand Comments at 11. Neither the selection of India as the surrogate nor the Indian import values themselves were timely challenged, even in this litigation (much less at the agency level). It is clearly too late to raise such an issue at this advanced stage. *See generally* Def.'s Supp. Brief at 3-6; Def.-Int.'s Supp. Brief at 11-17.

ZMC failed to raise the issue in the underlying administrative proceeding. Nor was the issue

included either in the Complaint it filed to commence this action, or in its Motion for Judgment on

the Agency Record.  As discussed above, the issue first surfaced in ZMC's comments to Commerce

on the Draft Remand Results.  *See* Remand Results at 18-19 (*quoting* questions posed by ZMC in

its comments on Draft Remand Results).[12]  And, incredibly, ZMC asserted for the first time in its

Reply Brief that the Court should order a remand and instruct Commerce to recalculate the surrogate

value for "scrap" used in the agency's NV calculations.  *See* Pl.'s Reply Brief at 9 (requesting that

the Court instruct Commerce "to disregard [in its calculations] any price for which there is a CVD

order from that country that determined there were 'industry specific' and/or 'broadly available,

non-industry specific export subsidies'").

Because ZMC failed to raise in a timely fashion the validity of the statistics used to calculate

the surrogate values for "scrap," its attempts to argue the issue now are barred by the doctrine of

exhaustion of administrative remedies.  *See generally* Def.'s Supp. Brief at 3-8; Def.-Int.'s Supp.

Brief at 12-16.[13]

---

[12]There can be no argument that the issue was properly raised in the course of the remand proceeding.  The remand was limited in scope to allowing Commerce to further explain its decision to use surrogate values, rather than ZMC's market prices, for steel inputs – *not* to allow Commerce to investigate the validity of the surrogate value used for "scrap."  To the extent that ZMC raised the issue before Commerce in the course of the remand proceeding, it exceeded the scope of the remand order.  Commerce properly declined to address the matter.  *See generally* Remand Results at 18-19; Def.'s Supp. Brief at 5; Def.-Int.'s Supp. Brief at 14-16.  In contrast, the issue was timely raised in Shandong Huarong.  *See* Def.-Int.'s Supp. Brief at 10-11; Shandong Huarong Mach. Co. v. United States, 29 CIT __,2005 WL 1105110 *9 (2005).

[13]The Government and Timken note that – even if ZMC's argument were not barred due to ZMC's failure to exhaust its administrative remedies – ZMC's argument would still fail for lack of support in the record of this case.  *See generally* Def.-Int.'s Supp. Brief at 16-17; Def.'s Brief at 40-41.

According to Timken, "[b]oth Commerce and the Court have stressed that only *some* subsidy

## IV. Conclusion

For all the reasons set forth above, Plaintiff's Motion for Judgment on the Agency Record

is denied, and Commerce's Final Results of Redetermination Pursuant to Remand are sustained.

Judgment will enter accordingly.

_____/s/_____
Delissa A. Ridgway
Judge

Decided:  January 29, 2007
          New York, New York

---

programs can form the basis for formulating suspicions that input values were subsidized. Commerce made this very clear in, for example, its memorandum entitled "Allegations of Unfair Steel Prices" . . . . The Court also made this clear in, *e.g.*, the Fuyao Glass litigation. . . . Therefore, it is not enough [for ZMC] merely to cite outstanding CVD orders. It is necessary to identify programs claimed to be bases for formulating suspicions and demonstrate their application, and to demonstrate their relevance to the claim at hand." *See* Def.-Int.'s Supp. Brief at 16.

Timken observes that, here, "plaintiff has completely failed to provide any predicate for its position that any foreign subsidy program taints Commerce's value for scrap. . . . Thus, even when viewing the question on the merits, plaintiff has failed in its burden of proof. There is no basis beyond speculation that Commerce erred by ignoring facts or otherwise acted contrary to law in determining the value for scrap." *See* Def.-Int.'s Supp. Brief at 17.

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————————

ZHEJIANG MACHINERY IMPORT &
   EXPORT CORP.,

                *Plaintiff*,

        v.

UNITED STATES,

               *Defendant*,

      and

THE TIMKEN COMPANY,

          *Defendant-Intervenor*.

—————————————————————————

:
:
:
:
:
:     Court No. 02-00792
:
:
:
:
:
:

## **<u>JUDGMENT</u>**

This case having been duly submitted for decision; and the Court, after due deliberation, having a rendered a decision herein;

Now, therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED, and DECREED that the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Remand be, and hereby are, sustained.



                                Delissa A. Ridgway, Judge

Dated: January 29, 2007
       New York, New York